**JURY TRIAL DEMANDED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION**

| | | |
|---|---|---|
| JENNIFER HARMON, Individually and as Surviving Mother of N.J., Decedent, and on BEHALF OF THE CLASS OF PERSONS DESIGNATED BY R.S.MO. § 537.080, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2:21-cv-00026 |
| SECOND JUDICIAL CIRCUIT OF THE STATE OF MISSOURI, | ) ) ) | |
| JEFF HALL, individually, and in his individual capacity, | ) ) ) | **JURY TRIAL DEMANDED** |
| WESTLEY SEIFERT, individually, and in his individual capacity, | ) ) ) | |
| MISTY GOINGS, individually, and in her individual capacity, | ) ) ) | |
| FRANK VORHEES, individually, and in his individual capacity, | ) ) ) | |
| PATRICK WILLIAMS, individually, and in his individual capacity, | ) ) ) | |
| JESSICA MORROW, individually, and in her individual capacity, | ) ) ) ) | |

RICHARD LOVE, a/k/a                        )
BRONSON LOVE, individually,                )
and in his individual capacity,            )
                                           )
DIANA SHIELDS, individually,               )
and in her individual capacity,            )
                                           )
DANIEL KENNEDY, individually,              )
and in his individual capacity,            )
                                           )
RACHEL VAN BEERS, individually,            )
and in her individual capacity,            )
                                           )
LISA WASSENHOVE, individually,             )
and in her individual capacity,            )
                                           )
BETTY ROBERTSON, individually,             )
and in her individual capacity,            )
                                           )
MICHELLE GOVRO, individually,              )
and in her individual capacity,            )
                                           )
TRACY FRANCIS, individually,               )
and in her individual capacity,            )
                                           )
        and                                )
                                           )
PREFERRED FAMILY HEALTHCARE,               )
INCORPORATED,                              )
                                           )
                Defendants.                )

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Jennifer Harmon, individually and as surviving mother and Class

I representative of Decedent N.J., through counsel, and on behalf of the class of individuals as

defined in R.S.Mo. § 537.080.1, and for her causes of action under 42 U.S.C. § 1983 and pursuant

to R.S.Mo. § 537.080 and § 537.090 for Wrongful Death against Defendants Second Judicial

Circuit of the State of Missouri, Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick

Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy,

Rachel Van Beers, Lisa Wassenhove, Betty Robertson, Michelle Govro, Tracy Francis, and Preferred Family Healthcare, Incorporated, states as follows:

## INTRODUCTION

1.      This is a civil rights case resulting from Defendants' violations of N.J.'s (deceased) rights and liberties under the United States Constitution and made pursuant to 42 U.S.C. §§ 1983 and 1988. This is also an action for wrongful death pursuant to Missouri's Wrongful Death Act and associated statutes, including but without limitation, R.S.Mo. § 537.080 and 537.090.

2.      While in the custody, care, and control of the Second Judicial Circuit of the State of Missouri, at its Bruce Normile Juvenile Justice Center ("BNJJC") in Kirksville, Missouri, and its administrators, juvenile officers, directors, superintendents, employees, agents, servants, and staff, including Defendants Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy, Rachel Van Beers, and Defendants Wassenhove, Robertson, and Govro, Defendants denied N.J. adequate and proper treatment for known serious medical and/or psychiatric conditions, and Defendants failed to protect N.J. from the same known risks of suicide and failed to have his serious medical needs addressed. Further, Defendants were negligent, and such negligence caused or contributed to cause the death of Decedent.

3.      Defendants Second Judicial Circuit Court of the State of Missouri and Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy, Rachel Van Beers will be referred to collectively as "Normile Defendants."

4.      Further, Defendants Tracy Francis and Preferred Family Healthcare, Incorporated (collectively, "PFH Defendants"), through their treatment of N.J. while in the custody, care, and

3

control of the Normile Defendants and Defendants Wassenhove, Robertson, and Govro, denied N.J. adequate and proper treatment for known serious medical and/or psychiatric conditions, and the PFH Defendants failed to protect N.J. from the same known risks of suicide and failed to have his serious medical needs addressed. Further, PFH Defendants were negligent, and such negligence caused or contributed to cause the death of Decedent.

5.      Defendants acted in deliberate indifference to the risks associated with N.J.'s known serious medical conditions and suicide, and Defendants' inaction amounted to a deliberate indifference to or tacit authorization of violative practices.

6.      As a direct and proximate result of Defendants' disregard of accepted standards and N.J.'s known and recognized conditions, N.J. not only experienced extensive pain and suffering, but he died a horrible and preventable death. Defendants' acts and omissions, occasioned under color of state law, evince a knowing and deliberately indifferent pattern of conduct in violation of the Fourteenth Amendments of the United States Constitution and state law, giving rise to both federal claims and pendent state law claims, including wrongful death/negligence causes of action.

## **PLAINTIFF**

7.      Plaintiff Jennifer Harmon ("Plaintiff") is the natural surviving mother of N.J., a 16-year-old who died on April 15, 2018 as a result of injuries sustained arising out his attempted suicide on April 11, 2018 while at Bruce Normile Juvenile Justice Center in Kirksville, Adair County, Missouri. Plaintiff is entitled to bring this wrongful death action on behalf of all individuals designated under RSMo. § 537.080.1(1) for the death of Decedent.

## DEFENDANTS

### *Normile Defendants*

8.      Bruce Normile Juvenile Justice Center is a place of public accommodation existing in and organized under the laws of the State of Missouri. More specifically, it is a residential treatment and secure detainment center located in Kirksville, Adair County, Missouri. The residential treatment center offers treatment and education to youth residents.

9.      Upon information and belief, Defendant Second Judicial Circuit of the State of Missouri ("Second Judicial Circuit") operates and administers the Bruce Normile Juvenile Justice Center and employs its personnel, including at all relevant times the "Normile Individual Defendants" described and defined herein.

10.     At all times relevant hereto, Defendant Second Judicial Circuit was acting by and through its agents, servants, and/or employees, actual or ostensible, including, but not limited to Defendants Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy, and Rachel Van Beers, each of whom were acting individually and within the course and scope of their employment with the Second Judicial Circuit. Defendant Second Judicial Circuit is liable for their actions or inactions described herein under the principles of vicarious liability and/or respondeat superior, and under the laws of the state of Missouri and/or federal law.

11.     Defendants Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy, and Rachel Van Beers will be referred to as "Normile Individual Defendants."

12.     Upon information and belief, at all times relevant to this action, Defendant Jeff Hall was an employee, servant, or agent of the Second Judicial Circuit of Missouri and was the Chief Juvenile Officer for the Second Judicial Circuit of the State of Missouri.

13.     Upon information and belief, at all times relevant to this action, Defendant Hall was responsible for the supervision and management of the residential treatment unit as well as the detention center and he acted both individually and within the course and scope of his employment/agency with Defendant Second Judicial Circuit.

14.     Defendant Second Judicial Circuit is liable for Mr. Hall's actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

15.     Upon information and belief, Defendant Hall is a citizen of the state of Missouri.

16.     Upon information and belief, at all times relevant to this action, Defendant Westley Seifert was an employee, servant, or agent of the Second Judicial Circuit of Missouri who was the Director of Residential Services for the BNJJC.

17.     Upon information and belief, at all times relevant to this action, Defendant Seifert was responsible for the supervision and management of the residential treatment unit at BNJJC and he acted both individually and within the course and scope of his employment/agency with Defendant Second Judicial Circuit.

18.     Defendant Second Judicial Circuit is liable for Mr. Seifert's actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

19.     Upon information and belief, Defendant Seifert is a citizen of the state of Missouri.

20.     Upon information and belief, at all times relevant to this action, Defendant Misty Goings was an employee, servant, or agent of the Second Judicial Circuit of Missouri and was the CEO/Detention Superintendent for the BNJJC.

21.     Upon information and belief, in this role, at all times relevant to this action, Defendant Goings, in cooperation with the Chief Juvenile Officer and the Court Services Administrator, was responsible for the development of programs and services for the treatment unit and services for the secure unit of BNJJC and she acted both individually and within the scope of her employment and agency with Defendant Second Judicial Circuit.

22.     Defendant Second Judicial Circuit is liable for Ms. Goings' actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

23.     Upon information and belief Defendant Goings is a citizen of the state of Missouri.

24.     Upon information and belief, at all times relevant to this action, Defendant Frank Vorhees was an employee, servant, or agent of the Second Judicial Circuit of Missouri who was a juvenile officer/shift supervisor who worked at the BNJJC and he acted both individually and within the scope of his employment and agency with Defendant Second Judicial Circuit.

25.     Defendant Second Judicial Circuit is liable for Mr. Vorhees' actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

26.     Upon information and belief Defendant Vorhees is a citizen of the state of Missouri.

27.     Upon information and belief, at all times relevant to this action, Defendant Patrick Williams was an employee, servant, or agent of the Second Judicial Circuit of Missouri who served in the position of as Administrator of the BNJJC.

28.     Upon information and belief, in this position, at all times relevant to this action,, Defendant Williams was responsible for the general oversight, supervision, and administration of all juvenile court services for the Second Judicial Circuit, including Juvenile Court Field Services, Secure Detention Services, Residential Treatment Services and Administrative Services and is responsible for the development and enforcement of policies, procedures and for the development of programs and services for the Juvenile Court and other areas of the court as assigned by the Presiding Circuit Judge, including the BNJJC and he acted both individually and within the scope of his employment and agency with Defendant Second Judicial Circuit.

29.     Defendant Second Judicial Circuit is liable for Mr. Williams' actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

30.     Upon information and belief, Defendant Williams is a citizen of the state of Missouri.

31.     Upon information and belief, at all times relevant to this action, Defendant Jessica Morrow was an employee, servant, or agent of the Second Judicial Circuit of Missouri who served in the position of shift supervisor at the BNJJC.

32.     Upon information and belief, in this position, at all times relevant to this action, Defendant Morrow was a Shift Supervisor at BNJJC and she acted both individually and within the scope of his employment and agency with Defendant Second Judicial Circuit.

33.     Defendant Second Judicial Circuit is liable for Ms. Morrow's actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

34.     Upon information and belief, Defendant Morrow is a citizen of the state of Missouri.

35.     Upon information and belief, at all times relevant to this action, Defendant Richard Love a/k/a Bronson Love was an employee, servant, or agent of the Second Judicial Circuit of Missouri and served in the position of as shift supervisor at the BNJJC.

36.     Upon information and belief, in this position, at all times relevant to this action, Defendant Love was a Shift Supervisor at BNJJC and he acted both individually and within the scope of his employment and agency with Defendant Second Judicial Circuit

37.     Defendant Second Judicial Circuit is liable for Mr. Love's actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

38.     Upon information and belief, Defendant Love is a citizen of the state of Missouri.

39.     Upon information and belief, at all times relevant to this action, Defendant Diana Shields was an employee, servant, or agent of the Second Judicial Circuit of Missouri who served in the position of Case Manager at the BNJJC.

40.     Upon information and belief, in this position, at all times relevant to this action, Defendant Shields was a Case Manager at BNJJC and she acted both individually and within the scope of her employment and agency with Defendant Second Judicial Circuit.

41.     Defendant Second Judicial Circuit is liable for Ms. Shields' actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

42.     Upon information and belief, Defendant Shields is a citizen of the state of Missouri.

43.     Upon information and belief, at all times relevant to this action, Defendant Daniel Kennedy was an employee, servant, or agent of the Second Judicial Circuit of Missouri and he served in the position of as Administrator of the BNJJC.

44.     Upon information and belief, in this position, at all times relevant to this action, Defendant Kennedy was a shift supervisor at BNJJC and he acted both individually and within the scope of his employment and agency with Defendant Second Judicial Circuit.

45.     Defendant Second Judicial Circuit is liable for Mr. Kennedy's actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

46.     Upon information and belief, Defendant Kennedy is a citizen of the state of Missouri.

47.     Upon information and belief, at all times relevant to this action, Defendant Rachel Van Beers was an employee, servant, or agent of the Second Judicial Circuit of Missouri who was an employee of the BNJJC.

48.     Upon information and belief, in this position, at all times relevant to this action, Defendant Van Beers assisted with the care of N.J. at BNJJC and she acted both individually and within the scope of her employment and agency with Defendant Second Judicial Circuit.

49.     Defendant Second Judicial Circuit is liable for Ms. Van Beers' actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

50.     Upon information and belief, Defendant Van Beers is a citizen of the state of Missouri.

51.     At all times relevant herein, the Normile Individual Defendants were acting within the course and scope of their employment with Defendant Second Judicial Circuit of Missouri, and/or their actions were expressly authorized and/or ratified by Defendant Second Judicial Circuit of Missouri.

### Missouri Department of Social Services Defendants

52.     Upon information and belief, at all times relevant to this action, Defendant Lisa Wassenhove was an employee, servant, or agent of the Missouri Department of Social Services and/or Children's Division.

53.     Upon information and belief, in this position, at all times relevant to this action, Defendant Wassenhove was a case manager within the Missouri Department of Social Services who took part in the coordination of N.J.'s care while in the care, custody, and control of Missouri Department of Social Services and/or Children's Division and she acted both individually and within the scope of her employment with the Missouri Department of Social Services and/or Children's Division.

54.     Upon information and belief, Defendant Wassenhove is a citizen of the state of Illinois.

55.     Upon information and belief, at all times relevant to this action, Defendant Betty Robertson was an employee, servant, or agent of the Missouri Department of Social Services and/or Children's Division.

56.     Upon information and belief, in this position, at all times relevant to this action, Defendant Robertson was a supervisor for the Missouri Department of Social Services, and took part in and oversaw N.J.'s care while in the care, custody, and control of Missouri Department of

Social Services and/or Children's Division and she acted both individually and within the scope of her employment with the Missouri Department of Social Services and/or Children's Division.

57.     Upon information and belief, Defendant Robertson is a citizen of the state of Missouri.

58.     Upon information and belief, at all times relevant to this action, Defendant Michelle Govro was an employee, servant, or agent of the Missouri Department of Social Services and/or Children's Division.

59.     Upon information and belief, in this position, at all times relevant to this action, Defendant Govro was Northeast Residential Coordinator for the Missouri Department of Social Services and/or Children's Division and took part in and N.J.'s care while in the care, custody, and control of Missouri Department of Social Services and/or Children's Division and she acted both individually and within the scope of her employment with the Missouri Department of Social Services and/or Children's Division.

60.     Upon information and belief, Defendant Govro is a citizen of the state of Missouri.

### *Preferred Family Healthcare Defendants*

61.     Upon information and belief, at all times relevant to this action, Defendant Tracy Francis was an employee, servant, or agent of the Preferred Family Healthcare, Incorporated ("Preferred Family Healthcare" or "PFH") who served as a social worker for Preferred Family Healthcare, Incorporated.

62.     Upon information and belief, in this position, Ms. Francis provided medical care to residents of BNJJC, including N.J., and performed this work pursuant to a written contract and/or arrangement between Preferred Family Healthcare, Incorporated and Second Judicial Circuit.

63.     Defendant Francis provided treatment to N.J. on multiple occasions from on or about March 12, 2018, through April 10, 2018.

64.     Defendant Preferred Family Healthcare, Incorporated is liable for Ms. Francis' actions described herein under the principles of vicarious liability and/or respondent superior and the laws of Missouri.

65.     Upon information and belief, Defendant Francis is a citizen of the state of Missouri.

66.     At the time of the negligent acts complained of herein and at all times relevant to this action, Defendant Francis was a licensed master social worker holding herself out to the public, and in particular to N.J., as a clinical social worker practicing within the State of Missouri.

67.     At the time of the wrongful acts complained of herein and at all times mentioned, Defendant Preferred Family Healthcare, Incorporated, was a Missouri corporation holding itself out to the public, and in particular to N.J., as a health care facility and provider. Defendant Preferred Family Healthcare, Incorporated was incorporated in Missouri and is registered to do, and conducts, regular business within the State of Missouri, and maintains a registered agent within the State of Missouri for said business activity.

68.     At all times relevant here, Defendant Francis and other employees, agents, or servants of Defendant Preferred Family Healthcare, Incorporated were acting within the course and scope of their employment with Defendant Preferred Family Healthcare, Incorporated and/or their actions were expressly authorized and/or ratified by Defendant Preferred Family Healthcare, Incorporated.

## JURISDICTION AND VENUE

69.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343 inasmuch as Plaintiff presents federal claims arising under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

70.    This Court has jurisdiction under 28 U.S.C. § 1367 to hear Plaintiff's state law claims in that all claims made herein are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution.

71.    The claims in this case arise out of or relate to Defendants' transaction of business, and Defendants' commission of tortious acts, within the state of Missouri. Therefore, this Court has personal jurisdiction over Defendants.

72.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in, and, at the time of this action was commenced, at least one of the Defendants was subject to personal jurisdiction in Kirksville, Adair County, Missouri, which lies within the Northern Division of the Eastern District of Missouri.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

73.    Jennifer Harmon is the natural mother of N.J., decedent.

74.    On February 8, 2018, N.J. was seen at Hannibal Regional Hospital in Hannibal, Missouri for suicidal thoughts, including specifically threatening to hang himself.

75.    N.J., prior to this time, had a history of suicidal ideations and had previously threatened to kill himself, which led to previous hospitalizations.

76.     On February 8, 2018, following his visit to Hannibal Regional Hospital, N.J. was admitted to the psychiatric unit at St. Anthony's Medical Center in St. Louis, Missouri due to potential for self-harm, suicidal ideation, depressed mood, and labile mood on that same day.

77.     During his visit to Hannibal Regional Hospital on February 8, 2018, N.J. admitted to a social worker that he had previously threatened to hang himself and give himself tattoos that he would then pick off.

78.     During his time at Hannibal Regional Hospital, N.J. also indicated to a Doctor that his preferred method of suicide was hanging.

79.     N.J. remained at St. Anthony's until February 15, 2018, on which date he was discharged.

80.     During his stay at St. Anthony's, N.J. was diagnosed with severe major depressive disorder.

81.     Beginning on or about February 20, 2018, N.J. was a resident at the residential treatment facility at Bruce Normile Juvenile Justice Center.

82.     On or about February 20, 2018, N.J. was placed into the care and legal and/or functional custody of the Second Judicial Circuit and its employees, agents, and servants and the BNJJC, upon a written placement agreement and actions consistent therewith.

83.     This placement agreement was signed by Defendant Wassenhove.

84.     From on or about February 20, 2018 until April 15, 2018, N.J. was involuntarily in the care and legal and/or functional custody of the Missouri Department of Social Services and/or Children's Division and its employees, agents, and servants, including Defendants Wassenhove, Robertson, and Govro.

85.     From February 20, 2018 until and through time of his attempted suicide and transport to the University of Missouri Hospital in Columbia on April 11, 2018, N.J. was in the legal and/or functional custody of the Second Judicial Circuit.

86.     By both the written placement agreement and actions consistent therewith, from February 20, 2018 through April 11, 2018, N.J. was in the care and custody of Defendant Second Judicial Circuit and its employees, agents, and servants, including Normile Individual Defendants.

87.     The Bruce Normile Juvenile Justice Center facility is owned by Adair County, Missouri, and is operated and administered by, and under the supervision and authority of, Defendant Second Judicial Circuit.

88.     Upon information and belief, the Second Judicial Circuit employs personnel of the Justice Center, including, at all relevant times, the Normile Individual Defendants.

89.     The BNJJC is a juvenile facility that houses individuals between the ages of 12 and 17.

90.     The BNJJC is divided into two general areas, a residential treatment area (the "Normile Family Center"), and a secure detention facility (the "Bruce Normile Detention Center").

91.     N.J. was placed into the residential treatment area at BNJJC.

92.     Despite not being in the secure detention facility portion of BNJJC, while at BNJCC, N.J. was not free to leave the BNJJC at his own discretion.

93.     During his time at the BNJJC, N.J. was being kept involuntarily at the facility.

94.     During this time, a special custodial relationship was created when N.J. was taken from the care of his mother and placed into the legal custody of the Missouri Department Social Services and/or Children's Division and the Second Judicial Circuit and their employees, agents,

or servants, including Normile Individual Defendants and Defendants Wassenhove, Robertson, and Govro

95.     Upon information and belief, prior to and during N.J.'s admission to BNJJC, Normile Defendants and Defendants Wassenhove, Robertson, and Govro knew of the need of, and importance for, an individual to be employed at the BNJJC who could develop, implement, and coordinate psychological services.

96.     Upon information and belief, prior to and during N.J.'s admission to BNJJC, Normile Defendants and Defendants Wassenhove, Robertson, and Govro were aware of the risk that individuals such as N.J., who were at a high-risk for self-harm and suicide, could perform acts of self-harm or attempt suicide as a result of such risk.

97.     Despite such knowledge, during the time of N.J.'s stay at BNJJC, no such individual was employed by Defendant Second Judicial Circuit at BNJJC or otherwise who could develop, implement, and coordinate psychological services for individuals at BNJJC, including N.J.

98.     While he was at the BNJJC, N.J. received mental health treatment from employees, agents, or servants of Defendant Preferred Family Healthcare, including Dr. Daniel Ulrich, and social worker Tracy Francis.

99.     This mental health treatment provided to N.J. by Defendant Preferred Family Healthcare and its employees, agents, or servants, was, upon information and belief, was provided pursuant to an agreement, contract, and/or arrangement between Defendant Second Judicial Circuit and Defendant Preferred Family Healthcare, Incorporated.

100.    Upon information and belief, the treatment of N.J. by Defendant Francis and/or employees, agents, or servants of Preferred Family Healthcare, Incorporated was performed at the BNJJC.

101.    The medical treatment provided to N.J. by Defendant Francis and/or employees, agents, or servants of Defendant Preferred Family Healthcare while N.J. was a resident of BNJJC was performed in an interdependent and deeply intertwined manner between Defendant Preferred Family Healthcare and Defendant Second Judicial Circuit, such that the actions of Defendant Preferred Family Healthcare should be fairly treated as that of the Defendant Second Judicial Circuit itself for purposes of liability under 42 U.S.C. § 1983.

102.    Further, the medical care provided by Defendant Francis and Defendant Preferred Family Healthcare was provided in furtherance of the Missouri Department of Social Services and/or Children's Division and Second Judicial Circuit's obligation to provide medical care to residents placed at the BNJJC.

### Admission and Stay at Bruce Normile Juvenile Justice Center

103.    The referral form received by Normile Defendants relating to N.J.'s admission into BNJJC noted that N.J. had a previous history of "Suicide threats / attempts."

104.    Defendant Robertson was noted as the person completing the referral form, and the form itself was signed by Defendant Wassenhove.

105.    The reason for placement on the referral form was that N.J. was beyond parental control, had been kicked out of school, run away from home, and committed status offenses.

106.    The referral form also noted that N.J. had threatened to commit suicide and had been hospitalized for this as recently as 02-08-2018 to 02-15-2018.

18

107.   The referral form further noted that N.J. had also admitted to cutting his arm by removing the tooth of a comb, sharpening it with his teeth and making scrapes on himself to let the pain out, and that he had recently given himself a homemade tattoo.

108.   Both the cutting and tattoo incidents were within the last 30 days prior to his transfer to BNJJC.

109.   The referral form noted that his estimated length of stay was less than five days.

110.   Upon his being placed in BNJJC, with knowledge of Normile Defendants, Plaintiff was allowed to keep a white cloth belt. This belt was identified on a "Resident Clothing Inventory" document dated February 20, 2018.

111.   Upon his entry into BNJJC, N.J. was given an intake admission assessment by employees of the BNJJC.

112.   On February 22, 2018, with respect to the topic of "Suicidal Ideation / Intent," this intake admission assessment form noted that N.J. scored "'3' by answering 'sometimes' to the questions 'Do you feel worthless and hopeless about your future?' 'Have you ever made statements such as, "If I get the chance I will kill myself" and "Have you ever had thoughts of hurting yourself and made plans to do it?"" Further, it noted that [N.J.] "stated that he was not currently experiencing either of these and that staff can recognize when he is feeling down he will come and talk about it with staff. [N.J.] stated he had attempted suicide 3 times in the past with the last attempt being 2 years ago."

113.   This February 22, 2018 assessment was signed by "Case Manager" Frank Vorhees and "Director of Residential Services" Westley Seifert.

114.   Upon information and belief, Defendant Vorhees and Defendant Seifert, along with the other Normile Individual Defendants, had inadequate education or training relating to the

medical treatment of minors, such as treatment of individuals experiencing mental health issues including suicidal ideations or past suicide attempts.

115.    On March 2, 2018, Defendant Seifert emailed Defendant Govro, Defendant Robertson, Wendy Potter, and Defendant Vorhees to advise them that N.J. had been accepted into the Normile Family Center.

116.    This letter was addressed to Defendant Govro.

117.    On or about March 5, 2018, approximately two weeks after his entry into BNJJC, another Intake Admission Assessment was performed, again signed by Defendant Vorhees and Defendant Seifert.

118.    On the first page of this assessment, it was specifically noted, in bold print, that N.J. "was hospitalized at St. Anthony's Medical Center from February 8, 2018 until February 15, 2018 for suicidal ideation."

119.    On or about that same date of March 5, 2018, a "Staffing-Treatment Team Meeting" document was completed and signed, upon information and belief, by employees of BNJJC, including Defendants Diana Shields, Daniel Kennedy, and Jessica Morrow.

120.    This Treatment Team Meeting document dated March 5, 2018 specifically included handwritten notes, which appear to note, "Self harm inside arm," "writing on arms," "coping?? (f-you)."

121.    On or about March 15, 2018, a family support team meeting occurred regarding N.J., and upon information and belief, was attended by, among others, Plaintiff, Defendant Vorheees, and Defendant Robertson.

20

122.     On or about April 9, 2018, a family support team meeting occurred regarding N.J., and, upon information and belief, was attended by, among others, Plaintiff, Decedent, Defendant Vorhees, and Defendant Wassenhove.

123.     On or about April 9, 2018, employees, agents, and/or servants of Defendant advised N.J. that he was going to soon be discharged on an emergency basis from the BNJJC residential treatment unit.

124.     On this same date, Defendant Seifert emailed Defendant Govro, Defendant Wassenhove, Jordin Luthenauer, Wendy Potter, and Defendant Vorhees with an emergency discharge letter, which served as a three day notice of emergency discharge from BNJJC.

125.     This letter was addressed to Defendant Govro.

126.     Upon information and belief, the three-day emergency notice letter was discussed by those attending the April 9, 2018 family support team meeting,

127.     On this same date, after learning of his imminent emergency discharge, N.J. placed his white cloth belt around his arm as a tourniquet and squeezed it tightly on at least two situations in the presence of employees, agents, or servants of Second Judicial Circuit and BNJJC.

128.     Despite this, no employees, agents, or servants of Second Judicial Circuit and BNJJC ever took N.J.'s belt away from him.

129.     On April 10, 2018, N.J. was seen by Defendant Francis at the BNJJC facility for a consultation.

130.     Defendant Francis, in her position with Preferred Family Healthcare, Incorporated, had previously provided medical treatment to N.J. on multiple occasions, following his placement at BNJJC.

131.    N.J. had also been seen by Dr. Daniel Ulrich, who in his position with Preferred Family Healthcare, Incorporated also provided care to N.J. on multiple occasions, following his placement at BNJJC.

132.    By the time of this visit, Defendant Francis was aware that N.J. had been advised that he was going to be discharged from the facility on an emergency basis.

133.    During this visit, N.J. advised Defendant Francis that he had been sleeping a lot, and that this was beneficial to him "so I don't have to feel."

134.    As a result of this visit, Defendant Francis observed that N.J. appeared to have a flat affect and made statements that seemed matter of fact.

135.    She also noted that N.J. did not smile nor did he show any emotion relating to the events of the past week, and that N.J. made minimal eye contact during the session.

136.    The "plan" noted in the medical record created by Defendant Francis regarding this visit was that "Client will be leaving the facility but is unsure of the date as he has been served with an emergency discharge. The clinician will no longer be seeing the client as he will be leaving the area."

137.    Upon information and belief, this visit with Defendant Francis lasted approximately 35 minutes and was not attended by anyone other than N.J. and Defendant Francis.

138.    Further, upon information and belief, Defendant Francis did not communicate any information to employees, agents, or servants of Second Judicial Circuit and the BNJJC, or the Missouri Department of Social Services and/or Children's Division.

139.    On April 9, April 10, and April 11, 2018, N.J. refused to take his medications for mental health issues.

140.    Defendant Van Beers noted N.J.'s failure to take medication on April 9, 2018 and April 10, 2018 in BNJJC notes dated these two days.

141.    Defendant Morrow noted N.J.'s failure to take medication on the night of April 10 and the morning of April 11 in a BNJJC note dated April 11, 2018

142.    Individuals such as N.J. who were staying at the residential treatment center were given the option to have a resident room check at certain times.

143.    On April 11, 2018, N.J. refused his optional resident room check.

144.    Despite his refusal to allow a room check by BNJJC and failure to take medication for three days, and in spite of the circumstances of N.J.'s mental health and imminent dismissal from the BNJJC facility, no employees of Defendant Second Judicial Circuit and BNJJC performed such a room check on April 11, 2018 prior to N.J.'s suicide attempt.

145.    At approximately 2:16 P.M. on April 11, 2018, N.J. entered his room and closed his door.

146.    On this day, and for several weeks before this day, it was the policy, rule, and/or order of Defendant Second Judicial Circuit that N.J. was to be checked on by employees, agents, or servants of Defendant Second Judicial Circuit at least every 15 minutes.

147.    Approximately two minutes after N.J. entered his room and closed, the door, Defendant Morrow walked up to N.J.'s wood room door and appeared to look at the door.

148.    During this "check," the door remained closed, and the only apparent way of seeing through the door was by way of a peep hole on the door.

149.    Defendant Morrow did not open N.J.'s door during this "check."

150.    Approximately seven minutes later, Defendant Morrow again walked up to N.J.'s door and appeared to try to look at the peep hole on the closed door without opening the door.

151.    Approximately 13 minutes later, at approximately 2:38 P.M. -- which was at least 22 minutes since N.J. had returned to his room and closed his door -- Defendant Morrow walked up to N.J.'s door and appeared to try to look through the peep hole of the closed door.

152.    After standing at the door for several seconds, Defendant Morrow then opened the door and looked into the room for approximately 15 seconds.

153.    She then apparently summoned two other individuals, believed to be Defendant Hall and Mark Konke, who then slowly entered the room approximately 45 seconds after Ms. Morrow had reached the door.

154.    When Defendant Hall and Mark Konke entered the room, they discovered N.J. hanging by his neck from his bathroom door, which he had done using his white cloth belt.

155.    However, according to policies of the Second Judicial Circuit, Defendant Morrow was not allowed to enter a room by herself with a male resident.

156.    As a result, when Defendant Morrow performed her final "room check" on N.J.'s room and observed his bathroom door was shut, Ms. Morrow could not immediately enter, but was required to obtain assistance from males, which included Defendant Vorhees and Mark Konke before entering the room.

157.    Upon entering into N.J.'s room, Defendant Vorhees opened N.J.'s closed bathroom door, at which time, N.J. then fell to the floor.

158.    Mark Konke subsequently began to perform CPR until emergency medical responders arrived.

159.    On April 11, 2018 N.J. attempted to commit suicide by hanging with his own belt in his room, while being involuntarily held at Bruce Normile Juvenile Justice Center.

160.   N.J. was subsequently airlifted to Columbia, Missouri and the University of Missouri hospital, where N.J. died on April 15, 2018 as a direct result of his April 11 suicide attempt.

161.   N.J.'s April 15, 2018 death was a direct result of his April 11, 2018 suicide attempt while at the BNJJC.

162.   The state Certification of Death noted N.J.'s cause of death was due to complications from self-asphyxiation, with the manner being suicide.

163.   Following N.J.'s April 11, 2018 suicide attempt, officers with the Kirksville Police Department investigated the circumstances of N.J.'s suicide attempt.

164.   During this investigation, police located a notebook of N.J.'s that was in his room at BNJJC.

165.   This notebook contained various writings, including having "Suicide," "Cut me open," "Fuck the doctor that's gonna save me when I cut my fucking heart" and "Slit my wrists like pattycake" scratched/written into the front/back covers. Upon information and belief, resident's notebooks were viewed and/or collected by employees, agents, and servants of BNJJC on a regular basis for review and returned to residents.

166.    Below is a photograph of the front cover of N.J.'s notebook that was found by police:



167.   Below is a photograph of the back cover of N.J.'s notebook that was found by police:



168.   Further, written on N.J.'s bathroom mirror were the words "Fuck you," "Kill Me," "My feelings are irrelevant," "Trust No One," a face with Xs for eyes, and the date of 12-17-17.

169.    Below is a photograph of N.J's bathroom mirror taken during the police investigation:



170.    After N.J.'s suicide attempt, but prior to his death, a wound, apparently due to N.J.'s prior self harm, was clearly visible on his left arm.

171.    In February 2009, the United States Office of Juvenile Justice and Delinquency Prevention Report issued a report entitled, "Juvenile Suicide in Confinement A National Survey." (*See* https://www.ojp.gov/pdffiles1/ojjdp/213691.pdf, last accessed March 18, 2021).

172.    According to the findings of that report, which analyzed 79 suicides committed by juveniles in juvenile facilities (which included residential treatment centers) during the period of 1995-1999, 98.7% (all but one) of the suicides were by hanging. *Id.* at 17.

173.    Of these 79 suicide victims, more 68.4% were Caucasian, 79.7% were male, and the average age of such victims were 15.7, with more than 70 percent of victims between ages 15-17. *Id.* at vii.

174.    Further, 69.6% of these victims had a history of suicidal behavior, including suicide attempts, suicidal ideation/threat, and suicidal gesture/self-mutilation. *Id.* at viii.

175.    41% of the suicide victims were found in less than 15 minutes after the last observation of the youth. *Id*. at. viii.

176.    According to this report, "[n]ational juvenile correctional standards and standard correctional practice indicate that juvenile facilities should have a written suicide prevention policy that details the identification and management of suicidal youth." *Id.*. at 21.

### COUNT I
**Fourteenth Amendment, 42 U.S.C. §1983**
**(Against Defendants Second Judicial Circuit and Patrick Williams)**

177.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

178.    Plaintiff brings Count I of this cause of action against Defendant Second Judicial Circuit and Patrick Williams pursuant to 42 U.S.C. § 1983 for damages for these Defendants' deprivation of Decedent's constitutionally protected life and liberty rights by reason of their violations of Decedent's substantive due process rights pursuant to the Fourteenth Amendment of the Constitution of the United States of America.

179.    Decedent N.J. was in the legal and/or functional care and custody of Defendant Second Judicial Circuit while at the BNJJC between February 20, 2018 and April 11, 2018.

180.    Decedent N.J. was involuntarily in the custody of Defendant Second Judicial Circuit while at the BNJJC between February 20, 2018 and April 11, 2018.

181.    Decedent N.J. had a clearly established constitutional right to be protected from the known risks of suicide and to have his serious medical needs addressed by Normile Defendants.

182.    Decedent N.J. had a constitutional right to a humane and safe living environment while confined under state authority at BNJJC.

183.    Defendant Williams, acting both in his capacity as agent of the Defendant Second Judicial Circuit and individually, at all times referenced in this Complaint, was acting under the color of state law.

184.    Upon information and belief, Defendant Williams was the administrator and final policymaker for the Second Judicial Circuit with respect to the operations of the BNJJC and, thus, for the Second Judicial Circuit in matters delegated or entrusted to him.

185.    Both before and at the time of the events alleged in this Complaint, the Second Judicial Circuit had policies, practices, customs and procedures which operated to deprive Decedent of his constitutional rights.

186.    Defendants Second Judicial Circuit and Williams knew of Decedent's serious medical needs, including the serious, imminent and substantial risk of self-harm and suicide and need for screening, monitoring and assistance to prevent his death by hanging, but willfully and recklessly failed to respond reasonably to these known risks and needs. Armed with this knowledge, these Defendants, acting alone and in concert, were deliberately indifferent to

Plaintiff's serious medical needs and maintained unconstitutional policies, practices, customs, and

procedures in that Defendants Second Judicial Circuit and Williams:

     a.   failed to train and supervise employees on suicide prevention, identification and/or monitoring of at-risk juveniles, detection and confiscation of dangerous items on juvenile's persons and in rooms, intake policies and procedures, and basic emergency responses to suicide attempts;

     b.   failed to implement or require the implementation of a suicide prevention or response policy and procedure, or maintained inadequate suicide prevention and response and intake policies and procedures that did not identify and/or monitor at-risk juveniles, identify and monitor prescription medication, permitted dangerous items to remain with at-risk juveniles, including but not limited to belts;

     c.   failed to enforce suicide prevention or response policies and procedures and to discipline employees for violations of such policies and procedures, and caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures;

     d.   failed to adequately staff the BNJJC facility or keep the ratio of staff to juveniles at an appropriate level;

     e.   upon information and belief, accepted N.J. as a resident despite the fact that Defendant Second Judicial Circuit did not employ a treatment coordinator during his time at BNJJC;

     f.   ignored Decedent's obvious and severe mental illnesses, including severe depression and history of suicidal ideations, and substantial risk of suicide;

     g.   failed to provide or obtain adequate medical treatment and/or therapy for Decedent's diagnosed conditions, including depression and history of suicidal ideations, and substantial risk of suicide;

     h.   failed to investigate Decedent's mental illnesses and substantial risk of suicide enough to make an informed judgment about his medical needs;

     i.   made decisions about Decedent's treatment and/or therapy for his diagnosed conditions and substantial risk of suicide based on non-medical factors, such as budgetary constraints and lack of staff;

31

j.  allowed individuals such as N.J. to enter their residential treatment facility despite their knowledge of plaintiff's medical history and high risk of suicide;

k.  delayed and/or interfered with Decedent's access to treatment and/or therapy for his diagnosed conditions and substantial risk of suicide;

l.  failed to take reasonable measures to abate the known risk of Decedent's suicide;

m.  failed to control and properly monitor Decedent's use and ingestion of prescription medication, or take appropriate action when he refused to take his prescription medication;

n.  provided and/or failed to remove dangerous items from Decedent's room or person that Decedent could use to harm himself, including but not limited to his belt;

o.  failed to place Decedent on suicide watch or closely monitor his room and his behavior;

p.  failed to perform visual checks necessary to monitor Decedent's actions and condition;

q.  delayed and/or interfered with access to emergency medical treatment after they found Decedent hanging in his cell;

r.  had a practice or custom of being deliberately indifferent to the violation by employees, agents, and servants of Defendant Second Judicial Circuit of the constitutional rights of individuals in its care, custody, and control, including Decedent; and/or

s.  otherwise intentionally or recklessly disregarded Decedent's right to adequate medical care.

187.   Normile Defendants were acting under the color of state statute, ordinance, regulation, custom, policy or usage.

188.   As a direct and proximate result of Defendants' constitutional violations set forth above, and as a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Decedent's serious medical needs and known

32

and obvious risk of self-harm was ignored, unmonitored, untreated and/or unidentified, Decedent was permitted to remain in his room with dangerous items, and Decedent was enabled to hang himself and commit suicide.

189.   Defendants' constitutional violations and Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, were deliberately indifferent to the known and substantial risk of suicide and serious medical needs of Decedent, and deprived him of his right to be free from punishment and to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution.

190.   As a direct and proximate result of Defendants' constitutional violations, and as a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Decedent died on April 15, 2018.

191.   As a direct and proximate result of Defendants' constitutional violations and Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Decedent's mental condition deteriorated, Decedent endured conscious pain and suffering and Decedent experienced a general decline in the quality of his life between the time he entered BNJJC and the time of his death.

192.   As a direct and proximate result of Defendants' constitutional violations, and as a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Decedent died on April 15, 2018.

193.   Defendants' actions have caused Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090 as a result of the wrongful death of Decedent, including the pain and suffering and death of Decedent, pecuniary losses, loss of earnings, medical expenses, funeral expenses, and the reasonable value

of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which the beneficiaries have been deprived by reason of such death.

194.    By reason of the foregoing, Plaintiff has been damaged and is entitled to fair and reasonable compensation.

195.    Defendants' conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of N.J. and others, and Defendants acted with a deliberate and flagrant disregard for the safety of N.J. and others, justifying the imposition of punitive and aggravating circumstances damages.

WHEREFORE, Plaintiff prays the Court enter a judgment on Count I in favor of Plaintiff and against Defendants, awarding as follows: compensatory and non-economic damages in a reasonable amount to be determined by a jury as set forth in Mo. Rev. Stat. § 537.090; punitive, exemplary, and aggravating circumstances damages in an amount sufficient to deter Defendants and others from like conduct; reasonable attorney's fees and costs incurred in this action pursuant to 42 U.S.C. §§ 1983 and 1988; and such other and further relief as the Court deems just and proper, together with costs and interest.

**COUNT II**
**42 U.S.C. §1983 – State-Created Danger**
**(Against Defendants Second Judicial Circuit, Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy, and Rachel Van Beers)**

196.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

197.    While in the legal and/or function custody of Defendant Second Judicial District, N.J. had a constitutional right to life and liberty protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

34

198.    N.J. also had a constitutional right to personal security, bodily integrity, to due process and to be secure and safe, all protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

199.    Normile Individual Defendants, acting both in their capacity as agents of the Defendant Second Judicial Circuit and individually, at all times referenced in this Complaint, were acting under the color of state law.

200.    While at the BNJJC, Decedent was member of a limited, precisely definable group; that is, juvenile individuals placed at and in the legal and/or functional care, custody, and control of the BNJJC.

201.    At the time of their actions, Normile Defendants knew or should have known that N.J. had a significant risk of suicide due to his known mental health conditions and medical history.

202.    At the time of their actions, Normile Defendants had actual and/or constructive knowledge of the risk that N.J. who was under Normile Defendants' custody and control, could try to attempt suicide, which would deprive N.J. of his right to life and liberty, his right to bodily integrity, and to his right to personal security.

203.    At the time of their actions, the Defendants knew of N.J.'s mental health conditions, health history, and high risk of suicidality, and it was readily foreseeable that he could attempt suicide which would result in the deprivation of N.J.'s constitutional right to personal security, bodily integrity, to due process and to be secure and safe.

204.    These risks were obvious or known to Normile Defendants.

205.    Normile Defendants enhanced the danger to N.J. and rendered him more vulnerable to the deprivation of his rights to an education, to personal security, to bodily integrity, and to be secure and left alone through numerous affirmative acts, including but not limited to:

35

    a.  Affirmatively continuing to allow N.J. to keep his belt in his possession while at the BNJJC;

    b.  Affirmatively failing to monitor N.J., including by failing to perform actual frequent checks on him while in his room at BNJJC;

    c.  Upon information and belief, accepting N.J. as a resident despite the fact that Defendant Second Judicial Circuit did not employ a treatment coordinator during his time at BNJJC;

    d.  Affirmatively failing to take appropriate action while aware that N.J. was refusing to take his medication for his mental health; and

    e.  Affirmatively committing other acts and omissions as yet undiscovered by Plaintiff.

206.    Normile Defendants committed these affirmative acts with a deliberate indifference to and reckless and willful disregard for N.J.'s constitutional rights. These affirmative acts increased the danger to N.J. and led to his injuries in that they:

    a.  Led to and allowed N.J. to attempt suicide in his room with his belt, which led to his death.

207.    These affirmative acts by Normile Defendants, taken as a whole and in the context of known to Defendants, increased the danger to N.J. and amount to egregious and outrageous behavior.

208.    Normile Defendants' conduct put N.J. at significant risk of serious, immediate, and proximate harm.

209.    Normile Defendants acted recklessly in conscious disregard of the risks.

210.    In total, Normile Defendants' actions shock the conscience.

211.    Normile Defendants' actions have caused Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090 as a result of the wrongful death of Decedent, including the pain and suffering and death of Decedent, pecuniary losses, loss of earnings, medical expenses, funeral expenses, and the

reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which the beneficiaries have been deprived by reason of such death.

212.    By reason of the foregoing, Plaintiff has been damaged and is entitled to fair and reasonable compensation.

213.    Defendants' conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of N.J. and others, and Defendants acted with a deliberate and flagrant disregard for the safety of N.J. and others, justifying the imposition of punitive and aggravating circumstances damages.

WHEREFORE, Plaintiff prays the Court enter a judgment on Count II in favor of Plaintiff and against Normile Defendants, awarding as follows: compensatory and non-economic damages in a reasonable amount to be determined by a jury as set forth in Mo. Rev. Stat. § 537.090; punitive, exemplary, and aggravating circumstances damages in an amount sufficient to deter Defendants and others from like conduct; reasonable attorney's fees and costs incurred in this action pursuant to 42 U.S.C. §§ 1983 and 1988; and such other and further relief as the Court deems just and proper, together with costs and interest.

## COUNT III
### Fourteenth Amendment, 42 U.S.C. §1983
### (Against Defendants Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy, and Rachel Van Beers)

214.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

215.    Plaintiff brings Count III of this cause of action against Defendants Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love

a/k/a Bronson Love, Diana Shields, Daniel Kennedy, and Rachel Van Beers pursuant to 42 U.S.C. § 1983 for damages for Defendants' deprivation of Decedent's constitutionally protected life and liberty rights by reason of Defendants' violation of Decedent's substantive and due process rights pursuant to the Fourteenth Amendment of the Constitution of the United States of America.

216. Decedent N.J. had a clearly established constitutional right to be protected from the known risks of suicide and to have his serious medical needs addressed.

217. Decedent N.J. had a constitutional right to a humane and safe living environment while confined under state authority at BNJJC and being treated by Defendant Francis and Defendant Preferred Family Healthcare.

218. Defendants Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy, and Rachel Van Beers knew of Decedent's serious medical needs, including the serious, imminent and substantial risk of self-harm and suicide and need for screening, monitoring and assistance to prevent his death by hanging, but willfully and recklessly failed to respond reasonably to these known risks and needs. Armed with this knowledge, these Defendants, acting alone and in concert, were deliberately indifferent to Plaintiff's serious medical needs and maintained unconstitutional policies, practices, customs, and procedures in that Defendants:

     a. failed to train and supervise employees on suicide prevention, identification and/or monitoring of at-risk juveniles, detection and confiscation of dangerous items on juvenile's persons and in rooms, intake policies and procedures, and basic emergency responses to suicide attempts;

     b. failed to implement or require the implementation of a suicide prevention or response policy and procedure, or maintained inadequate suicide prevention and response and intake policies and procedures that did not identify and/or monitor at-risk juveniles, identify and monitor prescription medication, permitted dangerous items to remain with at-risk juveniles, including but not limited to belts;

c.  failed to enforce suicide prevention or response policies and procedures and to discipline employees for violations of such policies and procedures, and caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures;

d.  failed to adequately staff the BNJJC facility or keep the ratio of staff to juveniles at an appropriate level;

e.  upon information and belief, accepted N.J. as a resident despite the fact that Defendant Second Judicial Circuit did not employ a treatment coordinator during his time at BNJJC;

f.  ignored Decedent's obvious and severe mental illnesses, including severe depression and history of suicidal ideations, and substantial risk of suicide;

g.  failed to obtain adequate medical treatment and/or therapy for Decedent's diagnosed conditions, including depression and history of suicidal ideations, and substantial risk of suicide;

h.  failed to investigate Decedent's mental illnesses and substantial risk of suicide enough to make an informed judgment about his medical needs;

i.  made decisions about Decedent's treatment and/or therapy for his diagnosed conditions and substantial risk of suicide based on non-medical factors, such as budgetary constraints and lack of staff;

j.  allowed individuals such as N.J. to enter their residential treatment facility despite their knowledge of plaintiff's medical history and high risk of suicide;

k.  delayed and/or interfered with Decedent's access to treatment and/or therapy for his diagnosed conditions and substantial risk of suicide;

l.  failed to take reasonable measures to abate the known risk of Decedent's suicide;

m.  failed to control and properly monitor Decedent's use and ingestion of prescription medication, or take appropriate action when he refused to take his prescription medication;

n.  provided and/or failed to remove dangerous items from Decedent's room or person that Decedent could use to harm himself, including but not limited to his belt;

o.  failed to place Decedent on suicide watch or closely monitor his room and his behavior;

p.  failed to perform visual checks necessary to monitor Decedent's actions and condition;

q.  delayed and/or interfered with access to emergency medical treatment after they found Decedent hanging in his cell;

r.  had a practice or custom of being deliberately indifferent to the violation by employees, agents, and servants of Defendant Second Judicial Circuit of the constitutional rights of individuals in its care, custody, and control, including Decedent; and/or

s.  otherwise intentionally or recklessly disregarded Decedent's right to adequate medical care.

219.   Defendants Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy, and Rachel Van Beers were acting under the color of state statute, ordinance, regulation, custom, policy or usage.

220.   As a direct and proximate result of Defendants' constitutional violations set forth above, and as a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Decedent's serious medical needs and known and obvious risk of self-harm was ignored, unmonitored, untreated and/or unidentified, Decedent was permitted to remain in his room with dangerous items, including his belt, and Decedent was enabled to hang himself and attempt suicide.

221.   Defendants' constitutional violations and Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, were deliberately indifferent to the known and substantial risk of suicide and serious medical needs of Decedent, and deprived

him of his right to be free from punishment and to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution.

222.    As a direct and proximate result of Defendants' constitutional violations, and as a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Decedent died on April 15, 2018.

223.    Defendants' actions have caused Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090 as a result of the wrongful death of Decedent, including the pain and suffering and death of Decedent, pecuniary losses, loss of earnings, medical expenses, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which the beneficiaries have been deprived by reason of such death.

224.    By reason of the foregoing, Plaintiff has been damaged and is entitled to fair and reasonable compensation.

225.    Defendants' conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of N.J. and others, and Defendants acted with a deliberate and flagrant disregard for the safety of N.J. and others, justifying the imposition of punitive and aggravating circumstances damages.

WHEREFORE, Plaintiff prays the Court enter a judgment on Count III in favor of Plaintiff and against Defendants, awarding as follows: compensatory and non-economic damages in a reasonable amount to be determined by a jury as set forth in Mo. Rev. Stat. § 537.090; punitive, exemplary, and aggravating circumstances damages in an amount sufficient to deter Defendants and others from like conduct; reasonable attorney's fees and costs incurred in this action pursuant

to 42 U.S.C. §§ 1983 and 1988; and such other and further relief as the Court deems just and proper, together with costs and interest.

## COUNT IV
**Wrongful Death - Negligence**
**(Against Defendant Second Judicial Circuit)**

226.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

227.    From February 20, 2018 through April 11, 2018, Decedent N.J., a minor, was in the care, custody, and control of Defendant Second Judicial Circuit as a result of his being placed at the BNJJC.

228.    While N.J. was at the BNJJC, Defendant Second Judicial Circuit owed Decedent a legal duty of care so as to prevent injury to Decedent.

229.    At all times in which N.J. was placed at the BNJJC, Defendant Second Judicial Circuit had a duty to possess and use the same degree of care ordinarily used by reasonable and/or careful juvenile treatment facilities to properly protect N.J. from foreseeable and unreasonable risks of harm posed by dangerous conditions.

230.    Defendant Second Judicial Circuit knew of Decedent's serious medical needs, including the serious, imminent and substantial risk of self-harm and suicide and need for screening, monitoring and assistance to prevent his death by hanging, but failed to respond reasonably to these known risks and needs. Armed with this knowledge, Defendant failed to protect Plaintiff in that Defendant Second Judicial Circuit:

> a.    failed to take reasonable measures to abate the known risk of Decedent's suicide;
>
> b.    failed to place N.J. in a room with a door that allowed adequate observation of N.J. while in his room; and/or

      c.   provided and/or failed to remove dangerous items from Decedent's room or person that Decedent could use to harm himself, including but not limited to his belt.

231.    Defendant Second Judicial Circuit, as a result of its level of control exercised over individuals such as Decedent, exercised possession and control over Decedent and, particularly, his belt with which he hanged himself.

232.    In light of Decedent's known high risk of self-harm, Decedent's belt was a dangerous condition that existed on the property of Defendant Second Judicial Circuit.

233.    Defendant Second Judicial Circuit, in light of the relationship between it and N.J., had the ability to control the property, the belt, and prevent N.J. from possessing it while in the care, custody, and control of Defendant Second Judicial Circuit.

234.    Defendant Second Judicial Circuit, despite the fact that it had control over Decedent's belt, allowed him to keep the belt during the entirety of his stay at BNJJC.

235.    The door to N.J.'s room, which did not allow for adequate viewing through a closed room door by way of window or other viewing mechanism, was also a dangerous condition that existed on the property of Defendant Second Judicial Circuit.

236.    These dangerous conditions in the possession of Defendant and/or Decedent created a reasonably foreseeable risk of harm of the kind the plaintiff incurred, namely his attempted suicide and death.

237.    Defendant Second Judicial Circuit had actual or constructive knowledge of the dangerous condition in sufficient time prior to Plaintiff's attempted suicide to have taken measures to protect against the dangerous condition.

238.    As a direct result of the existence of the dangerous condition, Decedent was injured and died.

239.    At all times mentioned herein, before and after, the above-described Normile Individual Defendants were agents, servants, and employees of Defendant Second Judicial Circuit and were at all such times acting within the scope and course of their agency and employment, and/or their actions were expressly authorized by the Defendant Second Judicial Circuit, and/or their actions were ratified by the Defendant Second Judicial Circuit making it vicariously liable for said actions under the doctrine of respondeat superior.

240.    As a direct and proximate result of Defendant's negligence, and as a direct and proximate result of Defendant's policies, customs, and procedures, combining, concurring and contributing, Decedent died on April 15, 2018.

241.    Defendant's actions have caused Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090 as a result of the wrongful death of Decedent, including the pain and suffering and death of Decedent, pecuniary losses, loss of earnings, medical expenses, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which the beneficiaries have been deprived by reason of such death.

242.    By reason of the foregoing, Plaintiff has been damaged and is entitled to fair and reasonable compensation.

243.    Defendant's conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of N.J. and others, and Defendant acted with a deliberate and flagrant disregard for the safety of N.J. and others, justifying the imposition of punitive and aggravating circumstances damages.

WHEREFORE, Plaintiff prays the Court enter a judgment on Count IV in favor of Plaintiff and against Defendant, awarding as follows: compensatory and non-economic damages in a

reasonable amount to be determined by a jury as set forth in Mo. Rev. Stat. § 537.090; punitive, exemplary, and aggravating circumstances damages in an amount sufficient to deter Defendant and others from like conduct; and such other and further relief as the Court deems just and proper, together with costs and interest.

**COUNT V**
**Wrongful Death - Negligence**
**(Against Defendants Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy, and Rachel Van Beers)**

244.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

245.     From February 20, 2018 through April 11, 2018, Decedent N.J., a minor, was in the care, custody, and control of Defendant Second Judicial Circuit and Defendants Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Patrick Williams, Jessica Morrow, Richard Love a/k/a Bronson Love, Diana Shields, Daniel Kennedy, and Rachel Van Beers as a result of his being placed at the BNJJC.

246.     While N.J. was at the BNJJC, Normile Individual Defendants owed Decedent a legal duty of care so as to prevent injury to Decedent.

247.     At all times in which N.J. was placed at the BNJJC, Normile Individual Defendants had a duty to possess and use the same degree of care ordinarily used by reasonable and/or careful employees, agents, and servants of juvenile treatment facilities to properly protect N.J. from foreseeable and unreasonable risks of harm posed by dangerous conditions.

248.     Normile Individual Defendants knew or should have known of Decedent's serious medical needs, including the serious, imminent and substantial risk of self-harm and suicide and need for screening, monitoring and assistance to prevent his death by hanging, but failed to respond

reasonably to these known risks and needs. Armed with this knowledge, Normile Individual Defendants failed to protect Decedent in that they:

a.   failed to train and supervise employees on suicide prevention, identification and/or monitoring of at-risk juveniles, detection and confiscation of dangerous items on juvenile's persons and in rooms, intake policies and procedures, and basic emergency responses to suicide attempts;

b.   failed to implement or require the implementation of a suicide prevention or response policy and procedure, or maintained inadequate suicide prevention and response and intake policies and procedures that did not identify and/or monitor at-risk juveniles, identify and monitor prescription medication, permitted dangerous items to remain with at-risk juveniles, including but not limited to belts;

c.   failed to enforce suicide prevention or response policies and procedures and to discipline employees for violations of such policies and procedures, and caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures;

d.   failed to adequately staff the BNJJC facility or keep the ratio of staff to juveniles at an appropriate level;

e.   ignored Decedent's obvious and severe mental illnesses, including severe depression and history of suicidal ideations, and substantial risk of suicide;

f.   failed to obtain adequate medical treatment and/or therapy for Decedent's diagnosed conditions, including depression and history of suicidal ideations, and substantial risk of suicide;

g.   failed to investigate Decedent's mental illnesses and substantial risk of suicide enough to make an informed judgment about his medical needs;

h.   made decisions about Decedent's treatment and/or therapy for his diagnosed conditions and substantial risk of suicide based on non-medical factors, such as budgetary constraints and lack of staff;

i.   allowed individuals such as N.J. to enter their residential treatment facility despite their knowledge of plaintiff's medical history and high risk of suicide;

j.   delayed and/or interfered with Decedent's access to treatment and/or therapy for his diagnosed conditions and substantial risk of suicide;

k.   failed to take reasonable measures to abate the known risk of Decedent's suicide;

l.   failed to control and properly monitor Decedent's use and ingestion of prescription medication, or take appropriate action when he refused to take his prescription medication;

m.   provided and/or failed to remove dangerous items from Decedent's room or person that Decedent could use to harm himself, including but not limited to his belt;

n.   failed to place Decedent on suicide watch or closely monitor his room and his behavior;

o.   failed to perform visual checks necessary to monitor Decedent's actions and condition;

p.   delayed and/or interfered with access to emergency medical treatment after they found Decedent hanging in his cell;

q.   upon information and belief, failed to escort and attend appointments of N.J. with employees of Preferred Family Healthcare without making different arrangements that were agreed upon by the Family Support Team, in violation of Second Judicial Circuit/BNJJC policy and procedure;

r.   failed to provide an adequate discharge plan with respect to N.J.'s discharge from BNJJC in violation of Second Judicial Circuit/BNJJC policy and procedure;

s.   discharged N.J. on an emergency basis (with less than 30 days' notice) despite not making a finding in the emergency discharge letter that Decedent was a danger to himself or others.

249.   As a direct and proximate result of Defendants' negligence, and as a direct and proximate result of Defendants' policies, customs, and procedures, combining, concurring and contributing, Decedent died on April 15, 2018.

250.   Defendants' actions have caused Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090 as a result of the wrongful death of Decedent, including the pain and suffering and death of Decedent,

pecuniary losses, loss of earnings, medical expenses, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which the beneficiaries have been deprived by reason of such death.

251.   By reason of the foregoing, Plaintiff has been damaged and is entitled to fair and reasonable compensation.

252.   Defendants' conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of N.J. and others, and Defendants acted with a deliberate and flagrant disregard for the safety of N.J. and others, justifying the imposition of punitive and aggravating circumstances damages.

WHEREFORE, Plaintiff prays the Court enter a judgment on Count V in favor of Plaintiff and against Defendants, awarding as follows: compensatory and non-economic damages in a reasonable amount to be determined by a jury as set forth in Mo. Rev. Stat. § 537.090; punitive, exemplary, and aggravating circumstances damages in an amount sufficient to deter Defendants and others from like conduct; and such other and further relief as the Court deems just and proper, together with costs and interest.

### COUNT VI
**Fourteenth Amendment, 42 U.S.C. §1983**
**(Against Defendants Tracy Francis and Preferred Family Healthcare)**

253.   Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

254.   Plaintiff brings Count VI of this cause of action against Defendants Francis and Preferred Family Healthcare pursuant to 42 U.S.C. § 1983 for damages for these Defendants' deprivation of Decedent's constitutionally protected life and liberty rights by reason of their

violations of Decedent's substantive due process rights pursuant to the Fourteenth Amendment of the Constitution of the United States of America.

255.    Decedent N.J. was in the legal and/or functional care and custody of Defendant Second Judicial Circuit while at the BNJJC between February 20, 2018 and April 11, 2018.

256.    Decedent N.J. was involuntarily in the custody of Defendant Second Judicial Circuit while at the BNJJC between February 20, 2018 and April 11, 2018.

257.    While he was at the BNJJC, N.J. received mental health treatment from employees, agents, or servants of Preferred Family Healthcare, including Dr. Daniel Ulrich, and social worker Tracy Francis.

258.    This mental health treatment provided to N.J. by Defendant Preferred Family Healthcare and its employees, agents, or servants, was, upon information and belief, provided pursuant to an agreement, contract, and/or arrangement between Defendant Second Judicial Circuit and Defendant Preferred Family Healthcare.

259.    Upon information and belief, the treatment of N.J. by Defendant Francis and/or employees, agents, or servants of Preferred Family Healthcare was performed at the BNJJC.

260.    The medical treatment provided to N.J. by Defendant Francis and/or employees, agents, or servants of Defendant Preferred Family Healthcare while N.J. was a resident of BNJJC was performed in an interdependent and deeply intertwined manner between Defendant Preferred Family Healthcare and Defendant Second Judicial Circuit, such that the actions of Defendant Francis and Defendant Preferred Family Healthcare should be fairly treated as that of the Defendant Second Judicial Circuit itself.

261.    Further, the medical care provided by Defendant Francis and Defendant Preferred Family Healthcare was provided in furtherance of the Second Judicial Circuit's and Missouri

Department of Social Services' and/or Children's Division's obligation to provide medical care to residents of the BNJJC.

262.    Decedent N.J. had a clearly established constitutional right to be protected from the known risks of suicide and to have his serious medical needs addressed by Normile Defendants, Missouri Department of Social Services and/or Children's Division, Defendants Wassenhove, Robertson, and Govro, Defendant Francis, and Defendant Preferred Family Healthcare.

263.    Decedent N.J. had a constitutional right to a humane and safe living environment while confined under state authority at BNJJC.

264.    Defendants Francis and Preferred Family Healthcare, acting both in their capacity as agent of the Defendant Second Judicial Circuit and/or Department of Social Services and/or Children's Division and individually, at all times referenced in this Complaint, were acting under the color of state law.

265.    Both before and at the time of the events alleged in this Complaint, Defendants Francis and Preferred Family Healthcare had policies, practices, customs and procedures which operated to deprive Decedent of his constitutional rights.

266.    Defendants Francis and Preferred Family Healthcare knew of Decedent's serious medical needs, including the serious, imminent and substantial risk of self-harm and suicide and need for screening, monitoring and assistance to prevent his death by hanging, but willfully and recklessly failed to respond reasonably to these known risks and needs. Armed with this knowledge, these Defendants, acting alone and in concert, were deliberately indifferent to Plaintiff's serious medical needs and maintained unconstitutional policies, practices, customs, and procedures in that they:

a.   failed to take appropriate action to prevent or warn against the risk of Decedent's committing suicide while in the care, custody, and control of Defendant Second Judicial Circuit at BNJJC;

b.   failed to communicate with employees, agents, or servants of Defendant Second Judicial Circuit regarding Decedent's mental health, medical treatment, and risk of self harm and suicide;

c.   failed to enforce suicide prevention or response policies and procedures and to discipline employees for violations of such policies and procedures, and caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures;

d.   ignored Decedent's obvious and severe mental illnesses, including severe depression and history of suicidal ideations, and substantial risk of suicide;

e.   failed to provide or obtain adequate medical treatment and/or therapy for Decedent's diagnosed conditions, including depression and history of suicidal ideations, and substantial risk of suicide;

f.   failed to investigate Decedent's mental illnesses and substantial risk of suicide enough to make an informed judgment about his medical needs;

g.   failed to take reasonable measures to abate the known risk of Decedent's suicide;

h.   failed to control and properly monitor Decedent's use and ingestion of prescription medication, or take appropriate action when he refused to take his prescription medication;

i.   provided and/or failed to ensure dangerous items were removed from Decedent's room or person that Decedent could use to harm himself, including but not limited to his belt;

j.   failed to place Decedent on suicide watch or closely monitor his room and his behavior;

k.   failed to ensure appropriate visual checks necessary to monitor Decedent's actions and condition were performed;

l.   had a practice or custom of being deliberately indifferent to the violation of the constitutional rights of individuals in its care, custody, and control, including Decedent; and/or

       m.  otherwise intentionally or recklessly disregarded Decedent's right to
           adequate medical care.

267.    Defendants Francis and Preferred Family Healthcare were deliberately indifferent to or tacitly authorized these unconstitutional policies, practices, customs, and procedures Defendants Francis and Preferred Family Healthcare had notice of such misconduct.

268.    Defendants Francis and Preferred Family Healthcare were acting under the color of state statute, ordinance, regulation, custom, policy or usage.

269.    As a direct and proximate result of PFH Defendants' constitutional violations set forth above, and as a direct and proximate result of PFH Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Decedent's serious medical needs and known and obvious risk of self-harm was ignored, unmonitored, untreated and/or unidentified, Decedent was permitted to remain in his room with dangerous items, and Decedent was enabled to hang himself and commit suicide.

270.    PFH Defendants' constitutional violations and their unconstitutional policies, practice, customs, and procedures, combining, concurring and contributing, were deliberately indifferent to the known and substantial risk of suicide and serious medical needs of Decedent, and deprived him of his right to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution.

271.    As a direct and proximate result of PFH Defendants' constitutional violations, and as a direct and proximate result of PFH Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Decedent died on April 15, 2018.

272.    PFH Defendants' actions have caused Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090 as a

result of the wrongful death of Decedent, including the pain and suffering and death of Decedent, pecuniary losses, loss of earnings, medical expenses, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which the beneficiaries have been deprived by reason of such death.

273.    By reason of the foregoing, Plaintiff has been damaged and is entitled to fair and reasonable compensation.

274.    Defendants' conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of N.J. and others, and Defendants acted with a deliberate and flagrant disregard for the safety of N.J. and others, justifying the imposition of punitive and aggravating circumstances damages.

WHEREFORE, Plaintiff prays the Court enter a judgment on Count VI in favor of Plaintiff and against PFH Defendants, awarding as follows: compensatory and non-economic damages in a reasonable amount to be determined by a jury as set forth in Mo. Rev. Stat. § 537.090; punitive, exemplary, and aggravating circumstances damages in an amount sufficient to deter Defendants and others from like conduct; and such other and further relief as the Court deems just and proper, together with costs and interest.

### COUNT VII
**Wrongful Death - Negligence**
**(Against Defendants Francis and Preferred Family Healthcare)**

275.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

276.    At all times relevant herein, Defendant Preferred Family Healthcare, Incorporated employed doctors, nurses, social workers, and other medical staff to provide medical care and treatment to patients, including N.J.

277.    At all times relevant herein, the acts and omissions of Defendant Preferred Family Healthcare, Incorporated's employees, including but not limited to Defendant Francis, were within the course and scope of their employment with Defendant Preferred Family Healthcare, Incorporated, and it is therefore vicariously liable for the acts and omissions of its employees.

278.    Defendant Francis owed a duty of care to Plaintiff to exercise that degree of skill and learning ordinarily used by members of her profession under the same or similar circumstances.

279.    Defendant Preferred Family Healthcare, Incorporated, its doctors, nurses, social workers, and staff, including but not limited to Defendant Francis, acting as agents, employees and ostensible agents of Preferred Family Healthcare, Incorporated, owed a duty of care to Plaintiff to exercise that degree of skill and learning ordinarily used by members in their profession under the same or similar circumstances.

280.    Beginning in February 2018, PFH Defendants rendered medical treatment to Plaintiff.

281.    PFH Defendants were negligent in their medical treatment and care of Plaintiff in that the treatment and care was not within the standard of due care, skill, and practice.

282.    Defendant Francis violated the standard of care by:

   a.   Negligently and carelessly failing to properly provide appropriate medical treatment and consultation to Plaintiff;

   b.   Negligently and carelessly failing to treat Plaintiff's mental health issues;

   c.   Negligently and carelessly failing to recognize Plaintiff's high risk of suicide and self-harm and taking action to help prevent the risk thereof;

   d.   Negligently and carelessly failing to recognize that N.J.'s placement at BNJJC was inadequate to address his severe mental health needs and risk for suicide;

e.  Negligently and carelessly failing to observe N.J.'s increased depression and to take any reasonable action to reduce his depression;

f.  Negligently and carelessly failing to recognize and intervene appropriately to decrease N.J.'s suicide risk;

g.  Negligently and carelessly failing to communicate with employees, agents, and servants of Bruce Normile Juvenile Justice Center about N.J.'s mental health conditions, including his high risk of suicide and self-harm; and

h.  Committing other acts of negligence and carelessness which have not yet been discovered.

283.  Defendant Preferred Family Healthcare, Incorporated violated the standard of care by:

a.  Negligently and carelessly hiring Defendant Francis;

b.  Negligently and carelessly failing to ensure Defendant Francis had adequate supervision in her treatment of patients, including N.J.;

c.  Negligently and carelessly hiring their employees, agents, and partners;

d.  Negligently and carelessly failing to recognize that N.J.'s placement at BNJJC was inadequate to address his severe mental health needs and risk for suicide;

e.  Negligently and carelessly failing to recognize and intervene appropriately to decrease N.J.'s suicide risk;

f.  Negligently and carelessly failing to properly supervise Defendant Francis;

g.  Negligently and carelessly failing to observe N.J.'s increased depression and to take any reasonable action to reduce his depression;

h.  Negligently and carelessly failing to properly supervise their employees, agents, and partners;

i.  Negligently and carelessly failing to train its physicians with regard to the treatment of potentially suicidal patients;

j.   Negligently and carelessly failing to adequately investigate Defendant Francis' background;

k.   Negligently and carelessly retaining Defendant Francis as an employee;

l.   Negligently and carelessly retaining its employees, agents, and partners;

m.   Negligently and carelessly failing to provide Plaintiff with a safe environment to receive medical care;

n.   Negligently and carelessly failing to enact, provide, and enforce policies and procedures to ensure that patients are properly treated for their specified complaints;

o.   Negligently and carelessly failing to enact, provide, and enforce policies and procedures to ensure that patients' providers are appropriately and properly treating their patients; and

p.   Committing other acts of negligence and carelessness which have not yet been discovered.

284.   As a direct and proximate result of these Defendants' violations, and as a direct and proximate result of Defendants' negligent actions and inactions, Decedent died on April 15, 2018.

285.   Defendants' actions have caused Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090 as a result of the wrongful death of Decedent, including the pain and suffering and death of Decedent, pecuniary losses, loss of earnings, medical expenses, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which the beneficiaries have been deprived by reason of such death.

286.   By reason of the foregoing, Plaintiff has been damaged and is entitled to fair and reasonable compensation.

287.   Defendants' conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of N.J. and others, justifying the imposition of punitive damages.

288.    Defendants' conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of N.J. and others, and Defendants acted with a deliberate and flagrant disregard for the safety of N.J. and others, justifying the imposition of punitive and aggravating circumstances damages.

WHEREFORE, Plaintiff prays the Court enter a judgment on Count VII in favor of Plaintiff and against Defendants, awarding as follows: compensatory and non-economic damages in a reasonable amount to be determined by a jury as set forth in Mo. Rev. Stat. § 537.090; punitive, exemplary, and aggravating circumstances damages in an amount sufficient to deter Defendants and others from like conduct; and such other and further relief as the Court deems just and proper, together with costs and interest.

## COUNT VIII
### Fourteenth Amendment, 42 U.S.C. §1983
### (Against Defendants Wassenhove, Robertson, and Govro)

289.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

290.    Plaintiff brings Count VIII of this cause of action against Defendants Wassenhove, Robertson, and Govro pursuant to 42 U.S.C. § 1983 for damages for Defendants' deprivation of Decedent's constitutionally protected life and liberty rights by reason of Defendants' violation of Decedent's substantive and due process rights pursuant to the Fourteenth Amendment of the Constitution of the United States of America.

291.    Decedent N.J. was involuntarily in the custody of Defendants Wassenhove, Robertson, and Govro from February 20, 2018 through April 15, 2018, including while at the BNJJC between February 20, 2018 and April 11, 2018.

292.    Decedent N.J. had a clearly established constitutional right to be protected from the known risks of suicide and to have his serious medical needs addressed.

293.    Decedent N.J. had a constitutional right to a humane and safe living environment while confined under state authority through the Missouri Department of Social Services and/or Children's Division, Second Judicial Circuit, BNJJC and while being treated by Defendant Francis and Defendant Preferred Family Healthcare.

294.    Defendants Wassenhove, Robertson, and Govro knew of Decedent's serious medical needs, including the serious, imminent and substantial risk of self-harm and suicide and need for screening, monitoring and assistance to prevent his death by hanging, but willfully and recklessly failed to respond reasonably to these known risks and needs. Armed with this knowledge, these Defendants, acting alone and in concert, were deliberately indifferent to Plaintiff's serious medical needs and maintained unconstitutional policies, practices, customs, and procedures in that Defendants:

      a.   failed to train and supervise employees on suicide prevention, identification and/or monitoring of at-risk juveniles, detection and confiscation of dangerous items on juvenile's persons and in rooms, intake policies and procedures, and basic emergency responses to suicide attempts;

      b.   failed to ensure an adequate suicide prevention or response policy and procedure, or maintained inadequate suicide prevention and response and intake policies and procedures that did not identify and/or monitor at-risk juveniles, identify and monitor prescription medication, permitted dangerous items to remain with at-risk juveniles, including but not limited to belts;

      c.   failed to enforce suicide prevention or response policies and procedures and to discipline employees for violations of such policies and procedures, and caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures;

d.   failed to ensure that N.J.'s placement at BNJJC was in the most appropriate and least restrictive environment available for the shortest period of time as clinically indicated;

e.   failed to ensure the BNJJC facility was adequately staffed or kept the ratio of staff to juveniles at an appropriate level;

f.   upon information and belief, allowed N.J. to be placed at BNJJC as a resident despite the fact that Defendant Second Judicial Circuit did not employ a treatment coordinator during his time at BNJJC;

g.   ignored Decedent's obvious and severe mental illnesses, including severe depression and history of suicidal ideations, and substantial risk of suicide;

h.   failed to obtain adequate medical treatment and/or therapy for Decedent's diagnosed conditions, including depression and history of suicidal ideations, and substantial risk of suicide;

i.   failed to investigate Decedent's mental illnesses and substantial risk of suicide enough to make an informed judgment about his medical needs;

j.   allowed individuals such as N.J. to enter their residential treatment facility despite their knowledge of plaintiff's medical history and high risk of suicide;

k.   delayed and/or interfered with Decedent's access to treatment and/or therapy for his diagnosed conditions and substantial risk of suicide;

l.   failed to take reasonable measures to abate the known risk of Decedent's suicide;

m.   failed to control and properly monitor Decedent's use and ingestion of prescription medication, or take appropriate action when he refused to take his prescription medication;

n.   provided and/or failed to remove dangerous items from Decedent's room or person that Decedent could use to harm himself, including but not limited to his belt;

o.   failed to place Decedent on suicide watch or closely monitor his room and his behavior;

p.  failed to ensure visual checks necessary to monitor Decedent's actions and condition were performed;

q.  had a practice or custom of being deliberately indifferent to the violation of the constitutional rights of individuals in its care, custody, and control, including Decedent; and/or

r.  otherwise intentionally or recklessly disregarded Decedent's right to adequate medical care.

295.    Defendants Wassenhove, Robertson, and Govro were acting under the color of state statute, ordinance, regulation, custom, policy or usage.

296.    As a direct and proximate result of Defendants' constitutional violations set forth above, and as a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Decedent's serious medical needs and known and obvious risk of self-harm was ignored, unmonitored, untreated and/or unidentified, Decedent was permitted to remain in his room with dangerous items, and Decedent was enabled to hang himself and attempt suicide, due to which he died on April 15, 2018.

297.    Defendants' constitutional violations and Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, were deliberately indifferent to the known and substantial risk of suicide and serious medical needs of Decedent, and deprived him of his right to be free from punishment and to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution.

298.    As a direct and proximate result of Defendants' constitutional violations, and as a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Decedent died on April 15, 2018.

299.    Defendants' actions have caused Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090 as a

result of the wrongful death of Decedent, including the pain and suffering and death of Decedent, pecuniary losses, loss of earnings, medical expenses, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which the beneficiaries have been deprived by reason of such death.

300.    By reason of the foregoing, Plaintiff has been damaged and is entitled to fair and reasonable compensation.

301.    Defendants' conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of N.J. and others, and Defendants acted with a deliberate and flagrant disregard for the safety of N.J. and others, justifying the imposition of punitive and aggravating circumstances damages.

WHEREFORE, Plaintiff prays the Court enter a judgment on Count VIII in favor of Plaintiff and against Defendants, awarding as follows: compensatory and non-economic damages in a reasonable amount to be determined by a jury as set forth in Mo. Rev. Stat. § 537.090; punitive, exemplary, and aggravating circumstances damages in an amount sufficient to deter Defendants and others from like conduct; reasonable attorney's fees and costs incurred in this action pursuant to 42 U.S.C. §§ 1983 and 1988; and such other and further relief as the Court deems just and proper, together with costs and interest.

## COUNT IX
**Wrongful Death - Negligence**
**(Against Defendants Wassenhove, Robertson, and Govro)**

302.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

303.    From February 20, 2018 through April 11, 2018, Decedent N.J., a minor, was in the care, custody, and control of the Missouri Department of Social Services and/or Children's

Division and Defendants Wassenhove, Robertson, and Govro, during which time he was placed at the BNJJC.

304.    While N.J. was in their care, custody, and control Defendants owed Decedent a legal duty of care so as to prevent injury to Decedent.

305.    At all times in which N.J. was in the care, custody, and control of Defendants, and while placed at the BNJJC, these Defendants had a duty to possess and use the same degree of care ordinarily used by reasonable and/or careful employees, agents, and servants of Missouri Department of Social Services and/or Children's Division to properly protect N.J. from foreseeable and unreasonable risks of harm posed by dangerous conditions.

306.    Defendants knew or should have known of Decedent's serious medical needs, including the serious, imminent and substantial risk of self-harm and suicide and need for screening, monitoring and assistance to prevent his death by hanging, but failed to respond reasonably to these known risks and needs. Armed with this knowledge, Defendants failed to protect Decedent in that they:

a.    failed to ensure that employees, agents, and staff at BNJJC were adequately trained and supervised on suicide prevention, identification and/or monitoring of at-risk juveniles, detection and confiscation of dangerous items on juvenile's persons and in rooms, intake policies and procedures, and basic emergency responses to suicide attempts;

b.    failed to ensure that BNJJC had implemented an adequate suicide prevention or response policy and procedure, or maintained an adequate suicide prevention and response and intake policies and procedures that identified and/or monitored at-risk juveniles, identified and monitored prescription medication, and did not permit dangerous items to remain with at-risk juveniles, including but not limited to belts;

c.    failed to enforce suicide prevention or response policies and procedures and to discipline employees for violations of such policies and procedures, and caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures;

d.  failed to ensure the BNJJC facility was adequately staffed or held the ratio of staff to juveniles at an appropriate level;

e.  failed to ensure that N.J.'s placement at BNJJC was the most appropriate and least restrictive environment available for the shortest period of time as clinically indicated;

f.  ignored Decedent's obvious and severe mental illnesses, including severe depression and history of suicidal ideations, and substantial risk of suicide;

g.  failed to obtain adequate medical treatment and/or therapy for Decedent's diagnosed conditions, including depression and history of suicidal ideations, and substantial risk of suicide;

h.  failed to investigate Decedent's mental illnesses and substantial risk of suicide enough to make an informed judgment about his medical needs;

i.  allowed individuals such as N.J. to enter the BNJJC residential treatment facility despite their knowledge of plaintiff's medical history and high risk of suicide;

j.  delayed and/or interfered with Decedent's access to treatment and/or therapy for his diagnosed conditions and substantial risk of suicide;

k.  failed to take reasonable measures to abate the known risk of Decedent's suicide;

l.  failed to control and properly monitor Decedent's use and ingestion of prescription medication, or take appropriate action when he refused to take his prescription medication;

m.  failed to ensure dangerous items were removed from Decedent's room or person that Decedent could use to harm himself, including but not limited to his belt;

n.  failed to ensure Decedent was placed on suicide watch or that his room and behavior were closely monitored;

o.  failed to ensure visual checks were performed that were necessary to monitor Decedent's actions and condition; and/or

p.  upon information and belief, failed to escort and attend appointments of N.J. with employees of Preferred Family Healthcare.

307.    As a direct and proximate result of Defendants' negligence, and as a direct and proximate result of Defendants' policies, customs, and procedures, combining, concurring and contributing, Decedent died on April 15, 2018.

308.    Defendants' actions have caused Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090 as a result of the wrongful death of Decedent, including the pain and suffering and death of Decedent, pecuniary losses, loss of earnings, medical expenses, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which the beneficiaries have been deprived by reason of such death.

309.    By reason of the foregoing, Plaintiff has been damaged and is entitled to fair and reasonable compensation.

310.    Defendants' conduct which caused this damage showed complete indifference to and/or conscious disregard for the health and safety of N.J. and others, and Defendants acted with a deliberate and flagrant disregard for the safety of N.J. and others, justifying the imposition of punitive and aggravating circumstances damages.

WHEREFORE, Plaintiff prays the Court enter a judgment on Count IX in favor of Plaintiff and against Defendants, awarding as follows: compensatory and non-economic damages in a reasonable amount to be determined by a jury as set forth in Mo. Rev. Stat. § 537.090; punitive, exemplary, and aggravating circumstances damages in an amount sufficient to deter Defendants and others from like conduct; and such other and further relief as the Court deems just and proper, together with costs and interest.

## JURY TRIAL DEMAND

Plaintiff respectfully requests a trial by jury on all issues.

HOLMAN SCHIAVONE, LLC


By: */s/ Anne Schiavone*
Anne Schiavone, 49349 (MO)
Brandon Corl, 58725 (MO) (*application for admission
pro hac vice forthcoming*)
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: 816.283.8738
Fax: 816.283.8739
aschiavone@hslawllc.com
bcorl@hslawllc.com

ATTORNEYS FOR PLAINTIFF