**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION**

| | |
|---|---|
| JENNIFER HARMON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 2:21-cv-00026-SEP |
| ) | |
| SECOND JUDICIAL CIRCUIT ) | |
| OF THE STATE OF MISSOURI, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

Before the Court are two motions to dismiss Plaintiff Jennifer Harmon's Amended Complaint (Doc. [46]). Docs. [47], [49]. The first was filed on behalf of Defendants Second Judicial Circuit of the State of Missouri (Second Circuit), Defendants Patrick Williams, Jeff Hall, Westley Seifert, Misty Goings, Frank Vorhees, Jessica Morrow, Richard (a/k/a Bronson) Love, Diana Shields, Daniel Kennedy, Rachel Van Beers (the Normile Defendants), and Defendants Lisa Wassenhove, Betty Robertson, and Michelle Govro (the Children's Division Defendants) (collectively, the Government Defendants). Doc. [47]. The second was filed on behalf of Defendants Tracy Francis and Preferred Family Healthcare Inc. (PFH) (together, the PFH Defendants). Doc. [49]. For the reasons set forth below, the motion of the Government Defendants will be granted, and the motion of the PFH Defendants will be granted in part.

**FACTUAL BACKGROUND**[1]

## I. N.J.'s visits to Hannibal Regional Hospital and St. Anthony's Medical Center.

This case is about the tragic death of a young person who suffered from severe mental illness. On February 8, 2018, minor N.J. was seen at Hannibal Regional Hospital in Hannibal, Missouri, for suicidal thoughts, including specific threats to hang himself. Doc. [46] ¶ 74. He had a history of suicidal ideation, which had led to prior hospitalizations. *Id.* ¶ 74.

On the same day, after the Hannibal Regional visit, N.J. was admitted to the psychiatric unit of St. Anthony's Medical Center in St. Louis, Missouri, due to self-harm, suicidal ideation, depression, and labile mood. *Id.* ¶ 76. During his stay, N.J. admitted to a social worker that he had previously

---

[1] The facts in this section are taken from the Amended Complaint, Doc. [46], and assumed true for purposes of the motions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

1

threatened to hang himself and would give himself tattoos that he would pick off. *Id.* ¶ 77. He also told a doctor at St. Anthony's that his preferred method of suicide was hanging. *Id.* ¶ 78. N.J. was diagnosed with severe major depressive disorder and was eventually discharged from St. Anthony's on February 15, 2018. *Id.* ¶¶ 79, 80.

## II. N.J. is placed in the custody of Missouri.

Around February 20, 2018, N.J. was taken into the protective custody of the Missouri Department of Social Services (DSS), Children's Division (Children's Division), and a motion for temporary protective custody pursuant to MO. REV. STAT. § 211.031 was filed the following day. *Id.* ¶¶ 81, 82. On February 23, the Lewis County Circuit Court entered an order granting Children's Division temporary protective custody. *Id.* ¶¶ 82, 83. On March 21, 2018, the same court entered a judgment and order placing N.J. in the legal custody of Children's Division, making N.J. a ward of the State of Missouri. *Id.* ¶¶ 84, 85.

## III. N.J. becomes a resident of the Bruce Normile Juvenile Justice Center.

On February 20, 2018, N.J. entered the Bruce Normile Juvenile Justice Center (BNJJC), where he was placed in the care of the Second Circuit via a written placement agreement signed by Defendant Lisa Wassenhove, a case manager within Children's Division and N.J.'s legal guardian.[2] *Id.* ¶¶ 53, 88, 95. The BNJJC, a juvenile facility housing children between the ages of 12 and 17, is divided into two areas: the residential treatment area (the Normile Family Center) and a secure detention facility (the Bruce Normile Detention Center). *Id.* ¶¶ 97, 98. N.J. was placed in the residential treatment area, but he was not free to leave. *Id.* ¶¶ 99-101.

When N.J. was admitted to the BNJJC, Defendant Robertson completed a referral form that was signed by Wassenhove and submitted to the Normile Defendants. *Id.* ¶¶ 111-12. That form noted that N.J. had a prior history of suicide threats and attempts, gave specific reasons explaining why N.J. was referred to BNJJC, and estimated that N.J.'s anticipated length of stay was fewer than five days. *Id.* ¶¶ 111, 117. The form stated that N.J. was beyond parental control, had been kicked out of school, had run away from home, and had committed "status offenses." *Id.* ¶ 113. The form further indicated that N.J. acknowledged cutting and giving himself a homemade tattoo (both of which occurred within the 30 days preceding his transfer to BNJJC), and that he had been hospitalized for threats of suicide as recently as February 8 through February 15, 2018. *Id.* ¶¶ 114-15. Upon entry,

---

[2] While the BNJJC is owned by Adair County, it is operated and administered by the Second Circuit. *Id.* ¶ 95.

N.J. was allowed to keep a white cloth belt, which was identified on a "Resident Clothing Inventory" document dated February 20, 2018.  *Id.* ¶ 118.

On February 22, 2018, N.J. received an intake admission assessment.  *Id.* ¶ 119.  According to the assessment form, N.J. scored a 3 with respect to "Suicidal Ideation/Intent," because he answered "sometimes" to questions that asked whether he had previously contemplated suicide.[3]  *Id.* ¶ 120.  The form notes that N.J. "stated that he was not currently experiencing either of these and that staff can recognize when he is feeling down he will come and talk about it with staff," and that he had attempted suicide three times in the past, with the last time being two years ago.  *Id.*  The assessment form was signed by Defendant Frank Vorhees, a BNJJC case manager, and Defendant Westley Seifert, the BNJJC's Director of Residential Services.  *Id.* ¶ 121.  On March 2, 2018, Seifert emailed Defendant Michelle Govro, Defendant Robertson, Wendy Potter, and Defendant Vorhees, advising them that N.J. had been accepted to the Normile Family Center.  *Id.* ¶ 123.

On March 5, 2018, about two weeks after entering the BNJJC, N.J. received another intake admissions assessment signed by Defendants Vorhees and Seifert.  *Id.* ¶ 125.  In the second assessment, the first page notes in bold print that N.J. "was hospitalized at St. Anthony's Medical Center from February 8, 2018, until February 15, 2018, for suicidal ideation."  *Id.* ¶ 126.  Around that same date, employees of the BNJJC, including Defendants Diana Shields, Daniel Kennedy, and Jessica Morrow, completed and signed a "Staffing-Treatment Team Meeting" document that includes handwritten notes that appear to say, "Self harm inside arm," "writing on arms," "coping?? (F-you)."  *Id.* ¶¶ 127-28.

## IV.     **N.J. is set to leave the BNJJC.**

Around March 15, 2018, Defendants Vorhees and Robertson attended a family support team meeting with Plaintiff Harmon about N.J.  A similar meeting occurred around April 9, 2018, and was attended by Harmon, N.J., and Defendants Vorhees and Wassenhove.  *Id.* ¶¶ 129-30.  Around April 9, 2019, N.J. was advised that he was going to be discharged on an emergency basis from the BNJJC residential treatment unit, and Seifert emailed Govro, Wassenhove, Potter, and Vorhees an emergency discharge letter serving as a three days' notice of N.J.'s impending discharge.  *Id.* ¶¶ 131-32.  After learning about his imminent discharge, N.J. twice placed his white cloth belt around his arm as a

---

[3] The questions listed on the intake admission assessment include:  "Do you feel worthless and hopeless about your future?"  "Have you ever made statements such as, 'If I get the chance I will kill myself?'" and "Have you ever had thoughts of hurting yourself and made plans to do it?"  *Id.* ¶ 120.

tourniquet and squeezed it tightly in the presence of Second Circuit and BNJJC employees.[4]  *Id.* ¶ 135. No employee took away N.J.'s belt.  *Id.* ¶ 136.

## V. N.J. visits with Defendant Francis.

On April 10, 2018, Defendant Francis, a social worker employed by PFH, saw N.J. at the BNJJC for a 35-minute consultation.  *Id.* ¶ 137.  Francis had provided medical treatment to N.J. on several occasions since N.J.'s placement at the BNJJC, and she was aware that N.J. had been advised that he was going to be discharged from the facility on an "emergency basis."  *Id.* ¶¶ 61, 137-38, 140, 145.  During the consultation, N.J. told Francis that he had been sleeping a lot, and that it was beneficial so he didn't "have to feel."  *Id.* ¶ 141.  Francis observed that N.J. had a flat affect, made statements that seemed matter of fact, refrained from displaying emotion, and avoided eye contact. *Id.* ¶¶ 142-43.  After the visit, Francis noted in a medical record that "[c]lient will be leaving the facility but is unsure of the date as he has been served with an emergency discharge.  The clinician will no longer be seeing the client as he will be leaving the area."  *Id.* ¶ 144.  Francis was the only person at the consultation other than N.J., and she did not communicate any information from the consultation to the employees of the Second Circuit, the BNJJC, or Children's Division.  *Id.* ¶ 147.

## VI. N.J. refuses his medication.

From April 9 through April 11, 2018, N.J. refused to take his mental health medications.  *Id.* ¶ 148.  Defendant Van Beers noted that N.J. failed to take his medication on April 9, 2018, and April 10, 2018.  *Id.* ¶ 149.  Defendant Morrow acknowledged that N.J. failed to take his medications on the night of April 10, 2018, and in the morning of April 11, 2018.  *Id.* ¶ 150.

## VII. N.J. passes away.

On April 11, 2018, N.J. refused his optional room check. *Id.* ¶ 152.  No one performed a room check despite N.J.'s failure to take his medication, the circumstances surrounding N.J.'s mental health, and his imminent departure from the BNJJC.[5]  *Id.* ¶ 153.  At about 2:16 P.M., N.J. entered his room and closed his door.  *Id.* ¶ 154.  Approximately two minutes after N.J. entered his room and closed his door, Morrow walked up to N.J.'s wood door and "appeared to look at the door," without opening it.  *Id.* ¶¶ 156-58.  Seven minutes later, Morrow again approached N.J.'s door and, without opening it, "appeared to try to look at the peep hole."  *Id.* ¶ 159.  At about 2:38 P.M., Morrow walked up to the

---

[4] The Amended Complaint does not identify the employees who allegedly witnessed N.J. using the belt as a tourniquet.  *Id.* ¶ 135.

[5] Patients in the residential treatment center have the option to receive room checks at certain times.  *Id.* ¶ 151.

4

door a third time and again "appeared to try to look through the peep hole." *Id.* ¶ 160. After standing at the door several seconds, Morrow opened the door and looked into the room for about 15 seconds.[6] *Id.* ¶ 161. She thereafter summoned two individuals, believed to be Defendant Hall and Mark Konke, who then slowly entered the room about 45 seconds after Morrow had reached the door. *Id.* ¶ 162. When Hall and Konke entered, they found N.J. hanging by his neck from his bathroom door by means of the white cloth belt. *Id.* ¶ 163. When Vorhees opened the bathroom door, N.J.'s body fell to the floor and Konke began performing CPR until emergency responders arrived. *Id.* ¶¶ 166-167. N.J. was airlifted to the University of Missouri hospital located in Columbia, Missouri, where he died on April 15, 2018. *Id.* ¶ 169. His death certificate identified the manner of his death as suicide. *Id.* ¶ 171.

**VIII.   The police perform an investigation.**

Police officers investigating the circumstances of N.J.'s death found in his room a notebook with suicidal words and phrases etched into its front and back covers.[7] *Id.* ¶¶ 172-76. N.J.'s bathroom mirror was also covered in suicidal words and statements.[8] *Id.* ¶ 177.

**IX.   Plaintiff Harmon files suit.**

On March 31, 2021, Plaintiff Jennifer Harmon, the mother of N.J., filed this lawsuit seeking damages for the death of N.J. Doc. [1]. On June 17, 2021, she filed an Amended Complaint, asserting the following claims:

> **Count I:**   (42 U.S.C. § 1983) Fourteenth Amendment violations by the Second Circuit and Williams.
>
> **Count II:**   (42 U.S.C. § 1983) State-Created Danger against the Second Circuit and the Normile Defendants.
>
> **Count III:**   (42 U.S.C. § 1983) Fourteenth Amendment violations by the Normile Defendants.
>
> **Count IV:**   (State law) Wrongful Death – Negligence against the Second Circuit.
>
> **Count V:**   (State law) Wrongful Death – Negligence against the Normile Defendants.
>
> **Count VI:**   (42 U.S.C. § 1983) Fourteenth Amendment violations by Defendants Francis and PFH.

---

[6] Morrow did not immediately enter room after opening the door because Second Circuit policy prohibits female employees from entering the room of a male resident without being accompanied by a male staff member. *Id.* ¶¶ 164-65.

[7] The phrases include "[s]uicide," "[c]ut me open," "[f]uck the doctor that's going to save me when I cut my fucking heart," and "[s]lit my wrists like pattycake." *Id.* ¶ 174.

[8] The phrases on the bathroom mirror included "[f]uck you," "[k]ill me, "[m]y feelings are irrelevant," "Trust No One," and a face with "X"s for eyes. *Id.* ¶ 177.

>**Count VII:**   (State law) Wrongful Death – Negligence against Defendants Francis and PFH.
>
>**Count VIII:**   (42 U.S.C. § 1983) Fourteenth Amendment violations by the Children's Division Defendants.
>
>**Count IX:**   (State law) Wrongful Death – Negligence against the Children's Division Defendants.

Doc. [46] at 30, 35, 39, 43, 47, 50, 55, 59, 64.  On July 1, 2021, the Second Circuit, the Normile Defendants, and the Children's Division Defendants filed their motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and (b)(6), respectively.  Doc. [47].  Defendants Francis and PFH filed their motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) the same day.  Doc. [49].

## LEGAL STANDARD

"In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments." *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993) (citing *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)).  "In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction."  *Id.* (citing *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 731-32 (11th Cir. 1982)).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plaintiff "need not provide specific facts in support of [her] allegations," but she "must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level."  *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008) (citing *Twombly*, 550 U.S. at 555, n.3).  Formulaic recitation of the elements of a cause of action is insufficient, *Twombly*, 550 U.S. at 555, and the Court is not required to accept as true allegations that are no more than legal conclusions, *Iqbal*, 556 U.S. at 678.

## DISCUSSION

**I.     Government Defendants' Motion to Dismiss**

The Government Defendants advance four grounds for dismissal:  (1) the Court lacks subject matter jurisdiction over all of Plaintiff's claims; (2) the Second Circuit is entitled to both sovereign and Eleventh Amendment immunity; is not a "person" under 42 U.S.C. § 1983, and is unreachable by

6

respondeat superior; (3) the Normile and Children's Division Defendants are entitled to qualified and official immunity; and (4) the Amended Complaint lacks sufficient facts showing that the Government Defendants' actions proximately caused N.J.'s death. Doc. [47] ¶¶ 1-4.

### A. The Court has subject matter jurisdiction over Harmon's claims.

The Government Defendants argue that the Court lacks subject matter jurisdiction over Plaintiff's claims because they can be brought only under Missouri's wrongful death statute, MO. REV. STAT. § 537.080.1(1). Doc. [48] at 2. That argument is meritless.

Under 28 U.S.C. § 1331, this Court possesses subject matter jurisdiction over Harmon's § 1983 claims, which are brought under a federal cause of action. *See Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808 (1986) (noting that the "vast majority" of cases falling within the grant of federal question jurisdiction under 28 U.S.C. § 1331 are those for which federal law creates the cause of action) (citing *Franchise Tax Bd. of the State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 9 (1983) (quoting *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916))); *see also Islamic Cmty. Ctr. for Mid Westchester v. City of New Yonkers Landmark Pres. Bd.*, 258 F. Supp. 3d 405, 413 (S.D.N.Y. 2017) (With the exception of certain tax disputes, "the general rule is that federal district courts have subject matter jurisdiction over Section 1983 claims[.]"). And the Court also has supplemental jurisdiction over state law claims that form the same "case or controversy" with those claims over which the court has original jurisdiction. *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997); 28 U.S.C. § 1367(a) (noting that except as otherwise provided by rule or statute, the district courts "shall have supplemental jurisdiction over all claims . . . form[ing] part of the same case or controversy" as those claims within the district court's original jurisdiction).

The Government Defendants do not contest that Plaintiff's state claims are sufficiently related to her federal claims to justify supplemental jurisdiction. Rather, they argue that, because Plaintiff alleges that Defendants' violations of her son's civil rights caused his death, she may not bring her federal claims at all and is limited to a state wrongful death claim. They offer no case law support for that thesis,[9] which is contradicted by clear Eighth Circuit precedent. *See, e.g.*, *Andrews v. Neer*, 253 F.3d 1052, 1056-58 (8th Cir. 2001) (not only countenancing a § 1983 claim based on an injury resulting in

---

[9] The Government Defendants rely upon *Mickels v. Danrad* to support their jurisdictional argument. 486 S.W.3d 327, 329 (Mo. banc 2016). That case is inapposite. In *Mickels*, the Missouri Supreme Court merely explained the circumstances under which a tort action brought on behalf of a decedent must proceed under the state wrongful death statute, MO. REV. STAT. § 537.080, as opposed to the state survival statute, MO. REV. STAT. § 537.020. *Id.* at 329-30. *Mickels* involved no § 1983 claims.

7

death but consulting the Missouri wrongful death statute to determine that plaintiff had standing for the federal claim). Therefore, the argument fails.

### B. The Second Circuit is not a "person" under § 1983 and is shielded by the Eleventh Amendment.

In Counts I, II, and IV, Harmon sues the Second Circuit for constitutional violations and negligence. Doc. [46] at 30, 35, 43. The Second Circuit correctly points out that it is not a "person" under § 1983, and that the Eleventh Amendment shields it from both the federal and state claims. Therefore, Counts I, II, and IV against the Second Circuit must be dismissed.

An action under § 1983 may lie only against a "person" who subjects or causes another to be subjected to the deprivation of their federal rights. *See* 42 U.S.C. § 1983. While the term "person" includes natural persons as well as municipalities and political subdivisions, *see Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), it does not include the several States and their instrumentalities. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 64 (1989). The Eighth Circuit has made clear that a state court is not a "person" subject to suit under § 1983. *Clark v. Clark*, 984 F.2d 272, 273 (8th Cir. 1993) ("Courts are not persons within the meaning of 42 U.S.C. § 1983, and, if they were, the action would be barred by the Eleventh Amendment anyway."). Plaintiff cites only cases involving municipalities or counties as defendants, which are inapposite. Doc. [58] at 5 (citing *Monell*, 436 U.S. at 690; *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 33 (2010)).

Relatedly, and with respect to both the state and federal claims, the Second Circuit is also entitled to Eleventh Amendment immunity. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. While the text seems to foreclose suit in the federal courts only in certain diversity cases, the Amendment has come "to stand not so much for what it says, but for the presupposition . . . which it confirms." *Seminole Tribe of Fl. v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991)). The Eleventh Amendment bars suits in federal court against any state unless the state has consented to suit or Congress has abrogated the immunity by lawful exercise of its legislative power under § 5 of the Fourteenth Amendment.[10] *Welch*

---

[10] Congress did not abrogate Eleventh Amendment immunity by enacting 42 U.S.C. § 1983. *See Will*, 491 U.S. at 63 ("*Quern* held that § 1983 does not override a State's Eleventh Amendment immunity[.]"); *see also Quern v.*

*v. Texas Dept. of Highways & Pub. Transp.*, 483 U.S. 468, 473 (1987); *see also Seminole Tribe*, 517 U.S. at 54-59.

The test for whether a state has waived Eleventh Amendment immunity is a stringent one. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). A state may waive immunity by either voluntarily invoking federal court jurisdiction or by making a "clear declaration" of its intention to submit to the same. *Id.* at 675-76. "[A] State does not consent to suit in federal court by merely consenting to suit in its own courts, by stating its intent to 'sue and be sued,' or even by authorizing suits against it in 'any court of competent jurisdiction.'" *eScholar LLC v. Neb. Dep't of Educ.*, 497 F. Supp. 3d 414, 423 (D. Neb. 2020) (citing *Coll. Sav. Bank*, 527 U.S. at 676; *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 897 (8th Cir. 2000)). Rather, "a state may waive its immunity to suit in federal court . . . 'only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction.'" *Barnes v. State of Mo.*, 960 F.2d 63, 65 (8th Cir. 1992) (quoting *Welch*, 483 U.S. at 473).

Plaintiff argues that the Second Circuit is not the state for Eleventh Amendment purposes and that the Amended Complaint adequately pled a state law statutory exception to sovereign immunity. Doc. [58] at 6-7 (citing MO. REV. STAT. § 537.600.1(2)). The Court disagrees.

Whether the Second Circuit may avail itself of Eleventh Amendment immunity turns upon whether it is an "arm of the state." *Frenchman Cambridge Irr. Dist. v. Heineman*, 974 F. Supp. 2d 1264, 1278 (D. Neb. 2013) (citing *Pub. Sch. Ret. Sys. of Mo. v. State St. Bank & Trust Co.*, 640 F.3d 821, 826 (8th Cir. 2011)); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). This Court has previously found that a Missouri circuit court is covered by the Eleventh Amendment in a case that was affirmed by the Eighth Circuit, *McKlintic v. 36th Jud. Cir. Ct.*, 464 F. Supp. 2d 871, 875 (E.D. Mo. 2006), *aff'd by McKlintic v. 36th Jud. Cir. Ct.*, 508 F.3d 875, 877 (8th Cir. 2007); *see also Harris v. Mo. Ct. of Appeals, W. Dist.*, 787 F.2d 427, 429 (8th Cir. 1986) ("courts as entities are not vulnerable to § 1983 suits, because they are protected by state immunity under the eleventh amendment"); *Harris v. 16th Jud. Cir. of Mo.*, 2015 WL 3866985 (W.D. Mo. Jun. 23, 2015) (following the Eighth Circuit in *McKlintic* and *Harris*). Plaintiff presents no justification for departing from Eighth Circuit precedent

---

*Jordan*, 440 U.S. 332, 342 (1979) ("But neither logic, the circumstances surrounding the adoption of the Fourteenth Amendment, nor the legislative history of the 1871 Act compels, or even warrants, a leap . . . to the conclusion that Congress intended by the general language of the Act to overturn the constitutionally guaranteed immunity to the several States.")

applying the Eleventh Amendment to Missouri state courts. Accordingly, the Court finds that the Second Circuit is entitled to Eleventh Amendment immunity.

In considering Plaintiff's statutory exception argument, it is important to distinguish between Eleventh Amendment immunity and sovereign immunity. Sovereign immunity, "the privilege of the sovereign not to be sued without its consent," reflects the historical notion that the States, as sovereigns, enjoy the traditional immunity from suit belonging to the monarch at common law. *Church v. Missouri*, 913 F.3d 736, 742 (8th Cir. 2019) (quoting *Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011)); *see also Alden v. Maine*, 527 U.S. 706, 713 (1999). While the Eleventh Amendment reflects that same value, it also reflects the value of federalism by preserving the power of the States to determine where they might be sued. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984) (quoting *Hutto v. Finney*, 437 U.S. 678, 691 (1978)). Because sovereign immunity is distinct from the immunity afforded by the Eleventh Amendment, "a State may waive its common law sovereign immunity without waiving its Eleventh Amendment immunity under federal law." *eScholar LLC*, 497 F. Supp. 3d at 423 (citing *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306 (1990)); *see also Halderman*, 465 U.S. at 99 ("a State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued."). Assuming *arguendo* that the Second Circuit's alleged misconduct fits within Missouri's narrow statutory exceptions to sovereign immunity, *see* MO. REV. STAT. § 537.600, the Missouri statute does not unambiguously purport to waive Eleventh Amendment immunity. *See Long v. Curators of Univ. of Mo.*, 1993 WL 52821, at *3 (W.D. Mo. Feb. 23, 1993) ("After comparing the statutory language considered in [*Feeney*] and *Atascadero* [*State Hosp. v. Scanlon*, 473 U.S. 234 (1984)] with the Missouri statute, the court is not prepared to hold that § 537.600.2 waives Missouri's Eleventh Amendment immunity."). Thus, regardless of the statutory exceptions to sovereign immunity, the Second Circuit is still shielded by the Eleventh Amendment and must be dismissed from the lawsuit.

### C. Harmon's § 1983 claims against the Government Defendants are barred by qualified immunity.

In Counts I, II, III, and VIII, Harmon sues the Government Defendants under § 1983, alleging that they violated N.J.'s Fourteenth Amendment due process rights: (i) to be protected from the known risk of suicide and have his serious medical needs addressed; (ii) to be held in a safe and humane environment; and (iii) to not be subjected to a state-created danger. Doc. [46] ¶¶ 189, 190, 206, 207, 228, 229, 309, 310. Before explaining why these claims are barred by qualified immunity, the Court will attempt to articulate the constitutional theories that it believes Harmon presses.

10

### 1. *Harmon asserts N.J.'s right to be protected against risk of suicide while in custody.*

The right to be protected from the known risk of suicide ordinarily arises in the prison inmate context and under the Eighth Amendment. *See, e.g., Vaughn v. Greene Cnty., Ark.*, 438 F.3d 845, 850 (8th Cir. 2006) ("[T]he Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs."); *see also Lambert v. City of Dumas*, 187 F.3d 931, 936 (8th Cir. 1991) ("The right to have medical needs addressed [under the Eighth Amendment] includes the right to be protected from a known risk of suicide.") (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)); *Grigoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000). That right has also been recognized as arising out of the Fourteenth Amendment and thereby extending to pretrial detainees, among others. *Id.* (quoting *Owens v. Scott Cnty. Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003) (per curiam)). Whether a defendant has violated the right turns upon whether the defendant acted with deliberate indifference. "Deliberate indifference is 'akin to criminal recklessness,' something more than mere negligence." *A.H. v. St. Louis Cnty., Mo.*, 891 F.3d 721, 726 (8th Cir. 2018) (quoting *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)). To state a claim for deliberate indifference, a plaintiff must allege facts demonstrating that the defendant actually knew that the plaintiff was at substantial risk of serious harm and that the defendant did not respond reasonably to it. *A.H.*, 891 F.3d at 726 (citing *Koss*, 445 F.3d at 1042).

### 2. *Harmon asserts N.J.'s right to be held in safe and humane conditions while in state custody.*

Harmon relies upon *Youngberg v. Romeo*, 457 U.S. 307 (1982), and dictum in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), for her claim that N.J. had a substantive due process right to be protected while in state custody. Docs. [58] at 11-12.

In *Youngberg*, the Supreme Court recognized that, because it had recognized that the Fourteenth Amendment's Due Process Clause guarantees to civilly committed individuals with mental disabilities the right to safety and freedom from bodily restraint, "training may be necessary to avoid unconstitutional infringement of those rights." *Youngberg*, 457 U.S. at 318. Thus, "the minimally adequate training required by the Constitution is such training as may be reasonable in light of" the committed person's liberty interest in "safety and freedom from unreasonable restraints." *Id.* at 322. When decisions affecting such interests are made by professionals, they are presumptively valid, and liability cannot be imposed unless a decision is "such a substantial departure from accepted

professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.

Relying on *Youngberg*, the Supreme Court said in *DeShaney* that, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199-200 (citing *Youngberg*, 457 U.S. at 317). That is because "when the State, by affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on the state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200 (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *Youngberg*, 457 U.S. at 315-16). The Supreme Court ultimately held that the Department of Social Services did not violate DeShaney's substantive due process rights, as DeShaney was neither in state custody when he suffered his injuries nor placed into a dangerous situation that was created by the state. *Id.* at 201. To prevail on such a claim, in addition to facts showing that the right has arisen, the plaintiff must also allege facts showing how the governmental officer's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005) (quoting *Hawkins v. Holloway*, 316 F.3d 777, 780 (8th Cir. 2003)) (internal quotation marks omitted).

### 3. *Harmon asserts N.J.'s right to not be subjected to a state-created danger.*

Finally, Harmon presses a substantive due process claim under the state-created danger doctrine: "[T]he state owes a duty to protect individuals if it created the danger to which the individuals are subjected." *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011) (quoting *Hart*, 432 F.3d at 805). To succeed, Harmon must allege and prove that (1) N.J. was a member of a limited, precisely definable group, (2) that the defendants' conduct placed him at a significant risk of serious, immediate, and proximate harm, (3) that the risk was "obvious or known" to the defendants, (4) that the defendants recklessly disregarded the risk of harm of which they were aware, and (5) in total, the defendants' actions shock the conscience. *Id.* at 891 (quoting *Hart*, 432 F.3d at 805).

### 4. *Harmon fails to demonstrate that the Government Defendants' conduct violated N.J.'s clearly established constitutional rights.*

With respect to all of the above-mentioned constitutional theories brought under § 1983, the Government Defendants raise a qualified immunity defense. Doc. [48] at 8. Qualified immunity precludes suit against a government officer unless "(1) the evidence, viewed in the light most favorable

12

to the plaintiffs, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable officer would have known that his actions were unlawful.'" *Laird v. City of St. Louis, Mo.*, 2021 WL 4459705, at *5 (E.D. Mo. Sept. 29, 2021) (quoting *Bernini v. City of St. Paul*, 665 F.3d 997, 1002 (8th Cir. 2012)). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Graham v. Barnette*, 5 F.4th 872, 887 (8th Cir. 2021) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 580, 589 (2018)). "This generally requires a plaintiff to point to existing circuit precedent that involves sufficiently similar facts to squarely govern the officers' conduct in the specific circumstances at issue, or, in the absence of binding precedent, to present a robust consensus of cases of persuasive authority constituting settled law. *Graham*, 5 F.4th at 887 (quoting *Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020); *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017)) (internal citation and quotation marks omitted).

Setting aside whether the Amended Complaint sufficiently pleads constitutional violations against each of the Government Defendants, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), Harmon has not carried her burden of demonstrating that the allegedly violated rights are clearly established. *Lewis v. City of St. Louis*, 932 F.3d 646, 649 (8th Cir. 2019) ("[Plaintiff] bears the burden of showing that the law is clearly established."). Harmon describes as clearly established the right to receive state-provided protection upon entering the state's custody and when the state creates a danger to which a person is subjected. Doc. [58] at 10-11 (citing *Hart*, 432 F.3d at 805). She also asserts that it is clearly established that persons who are either institutionalized or wholly dependent upon the state retain the right to receive certain services and care from the government. *Id.* (citing *Youngberg*, 457 U.S. at 317). Finally, she cites *DeShaney* and *Boswell v. Sherburne County*, 849 F.2d 1117 (8th Cir. 1988), for the proposition that those with whom the state assumes a "special relationship" acquire a clearly established right to receive adequate protection. *Id.* at 11.

The cases Plaintiff cites may support the proposition that those in state custody have a clearly established right to minimum care and safety, but they speak only to broad constitutional principles, entirely untethered from the facts alleged in the Amended Complaint. *Lewis*, 932 F.3d at 640 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). To defeat each Government Defendant's qualified immunity defense, Plaintiff must point to precedent in which a defendant who acted similarly to that individual under sufficiently similar circumstances was held to have violated a plaintiff's substantive due process rights. *White*, 137 S. Ct. at 552 (noting that the circuit panel misunderstood the "clearly established" analysis because "[i]t failed to identify a case

13

where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment."). None of Plaintiff's cases satisfies that standard as to any of the Government Defendants.

In *Youngberg*, the Supreme Court vacated the Third Circuit's decision and instructed that on matters of care, safety, and training for civilly committed, mentally disabled persons, judgments by the appropriate professional are entitled to the presumption of correctness where the judgment does not amount to a substantial departure from accepted professional judgment, practice, or standards. *Youngberg*, 457 U.S. at 323-24. In *DeShaney*, the Supreme Court held that Winnebago County Department of Social Services personnel could not be held liable under the Due Process Clause for harm suffered by Joshua DeShaney at the hands of his father, because DeShaney was no longer in the state's custody when he suffered his injuries. *DeShaney*, 489 U.S. at 200-01. In *Hart*, the Eighth Circuit held that the City of Little Rock was entitled to judgment as a matter of law on plaintiff law enforcement officers' substantive due process claims because the City's handling of the officers' personnel files did not amount to deliberate indifference. *Hart*, 432 F.3d at 808-09. Finally, in *Boswell*, the Eighth Circuit held that Boswell, a six-month pregnant pretrial detainee, provided sufficient evidence at summary judgment to support a genuine factual dispute about whether each of the defendant jailers was subjectively aware that she was pregnant and miscarrying and disregarded her medical emergency. *Boswell*, 849 F.2d at 1122-23. None of those cases is sufficiently analogous to the facts here to have put any of the Government Defendants on notice that their conduct, as alleged in the Amended Complaint, violated N.J.'s substantive due process rights. Therefore, Counts I, II, III, and VIII must be dismissed.

### D. The Government Defendants are entitled to official immunity against Harmon's state law negligence claims.

In addition to her § 1983 claims, Harmon brings negligence claims under Missouri's wrongful death statute. Doc. [46] at 47, 55, 64. The Government Defendants argue that they are immune from those claims under the doctrine of official immunity. Doc. [48] at 12 (citing *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008)). That doctrine "protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts," but affords no protection for their negligence in the performance of ministerial acts. *Southers*, 263 S.W.3d at 610 (citing *Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. banc 2006); *Kanagawa v. State*, 685 S.W.2d 831, 835 (Mo. banc 1985) *overruled on other grounds by Alexander v. State*, 756 S.W.2d 539 (Mo. banc 1988)). "Dismissal based on an affirmative defense may

14

be appropriate if the petition clearly establishes 'on its face and without exception' that the claim is barred." *McCoy v. Martinez*, 480 S.W.3d 420, 424 (Mo. App. 2016) (quoting *Richardson v. City of St. Louis*, 293 S.W.3d 113, 139 (Mo. App. 2009)). The Government Defendants argue that nearly all of the actions performed with respect to N.J.'s care were discretionary acts. Doc. [48] at 13. Harmon responds that it was the policy of BNJJC to require checks on residents like N.J. every 15 minutes, and the Government Defendants violated that policy by allowing N.J. to stay in his room with the door shut for a full 22 minutes. Doc. [58] at 17-18 (citing Doc. [46] ¶ 155).

"Whether an act can be characterized as discretionary depends on the degree of reason and judgment required." *Southers*, 263 S.W.3d at 610 (citing *Kanagawa*, 685 S.W.2d at 836). "A discretionary act requires the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued." *Id.* (citing *Kanagawa*, 685 S.W.2d at 836). In contrast, a "ministerial function . . . is one 'of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed.'" *Id.* (quoting *Kanagawa*, 685 S.W.2d at 836). Missouri courts consider three factors when evaluating an act as either discretionary or ministerial: "(1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity." *Id.* (citing *Kanagawa*, 685 S.W.2d at 836). "In order to prescribe a ministerial duty, the statute or regulation must be mandatory and not merely directory." *McCoy*, 480 S.W.3d at 425 (citing *Boever v. Special Sch. Dist. of St. Louis City.*, 296 S.W.3d 487, 492 (Mo. App. 2009)); *see also J.M. v. Lee's Summit Sch. Dist.*, 545 S.W.3d 363, 372 (Mo. App. 2018) (recognizing that department-mandated rules may give rise to ministerial duty). "Absent allegations averring the existence of a statutory or departmentally-mandated duty and a breach of that duty, a petition fails 'to state a claim that is not barred by the doctrine of official immunity as a matter of law.'" *McCoy*, 480 S.W.3d at 425 (quoting *Boever*, 296 S.W.3d at 492); *but see Nguyen v. Grain Valley R-5 Sch. Dist.*, 353 S.W.3d 725, 730 (Mo. App. 2011) (trial court improperly shifted the burden of alleging a statute or regulation imposing a ministerial duty to the plaintiff). "Simply put, a plaintiff must plead facts establishing an exception to official immunity . . . to survive a motion to dismiss for failure to state a claim." *Stephens v. Dunn*, 453 S.W.3d 241, 251 (Mo. App. 2014).

Plaintiff has not alleged both the existence and breach of any statute, ordinance, regulation, or department-mandated rule imposing a duty upon any of the Government Defendants to perform a discrete act, which is a prerequisite for stating a claim that is not barred by Missouri's official immunity

doctrine. *See id.* at 250 ("Under the record before this Court, Stephens did not allege the existence or breach of any statutory or regulatory duty and, therefore, did not allege facts establishing an exception to the official immunity doctrine."). Although Plaintiff alleges that BNJJC had a policy that "N.J. was to be checked on" every 15 minutes, she does not allege that the policy specifically required opening the door to N.J.'s room. *Id.* ¶ 155. And Plaintiff also alleges that Morrow approached N.J.'s door three times between 2:16 PM and 2:38 PM, looking through the peephole at least twice (at 2:25 PM and 2:38 PM). *Id.* ¶¶ 154-60. Thus, assuming *arguendo* that the policy imposes a "ministerial duty" on Defendants, Plaintiff has not successfully alleged a breach of that policy. Her negligence claims against the Government Defendants are therefore barred by official immunity. Counts V and IX will be dismissed.

## II.     PFH Defendants' Motion to Dismiss

Plaintiff also sues Defendants Tracy Francis and Preferred Family Healthcare under § 1983 and for negligence. Doc. [46] at 50, 55. The PFH Defendants urge dismissal on three grounds: (1) they are immune from suit under §§ 210.114 and 210.135; (2) the allegations do not support an inference of proximate causation between their actions and N.J.'s injuries; and (3) Plaintiff fails to state a *Monell* claim against PFH. Doc. [49] at 2.

### A. Francis and PFH have not demonstrated that they are entitled to immunity.

The PFH Defendants argue that Count VII must be dismissed because: (1) they are protected by qualified immunity under MO. REV. STAT. § 210.114, and (2) they are also immune under § 210.135. The Court has insufficient information to dismiss on that basis.

#### *1. Francis and PFH have not demonstrated that they are entitled to immunity under MO. REV. STAT. § 210.114.*

With respect to the state law claims, Francis and PFH first argue that they are immune from suit under MO. REV. STAT. § 210.114. Doc. [50] at 4. Section 210.114 provides that:

> [e]xcept as otherwise provided in section 207.085, private contractors who in their capacities as children's services providers and agencies, as defined in section 210.110, receive state moneys from the division or the department for providing services to children and their families under section 210.112 shall have qualified immunity from civil liability for providing such services when the child is not in the physical care of such private contractor to the same extent that the children's division has qualified immunity from civil liability when the division or department directly provides such services.

MO. REV. STAT. § 210.114.1. Subsection 1 does not apply, however, where:

> a private contractor . . . knowingly violates a stated or written policy of the division, any rule promulgated by the division, or any state law directly related to child abuse

> and neglect, or any state law directly related to the child abuse and neglect activities of the division or any local ordinance relating to the safety condition of the property.

MO. REV. STAT. § 210.114.2. MO. REV. STAT. § 210.110 defines "children's services providers and agencies" as

> any public, quasi-public, or private entity with the appropriate level of training and expertise in delivering services to children and their families as determined by the children's division, and capable of providing direct services and other family services for children in the custody of the children's division or any such entities or agencies that are receiving state moneys for such services[.]

MO. REV. STAT. § 210.110(5).

The Court unfortunately does not have the benefit of guidance from Missouri courts as to how to apply this state statute, but based on the plain text, it appears to provide immunity when four conditions are met: (1) the contractor is a "children's services provider or agency" as defined by § 210.110(5); (2) the contractor receives state moneys from Children's Division or the Department of Social Services for providing services to children and their families pursuant to § 210.112; (3) the child is not in the contractor's physical care when the contractor provides the services; and (4) § 210.114.2's exclusion to immunity does not apply. Based on the Complaint alone, the Court cannot find that PFH and Francis meet all of those conditions. *See McCoy*, 480 S.W.3d at 424 ("Dismissal based on an affirmative defense may be appropriate if the petition clearly establishes '*on its face and without exception*' that the claim is barred.") (quoting *Richardson*, 293 S.W.3d at 139) (emphasis added). Therefore, a finding of immunity would be premature.[11] *See Harvey v. Great Circle*, 2019 WL 5579355, at *6 (E.D. Mo. Oct. 29, 2019) ("The Court must evaluate the Complaint on the four corners of the Complaint. There is little case law interpreting these immunity statutes and this case is unique. It would be premature to dismiss these claims without further fact development.").

### 2. *Francis and PFH have not demonstrated that they are entitled to immunity under MO. REV. STAT. § 210.135.*

Francis and PFH also argue that they are immunized under MO. REV. STAT. § 210.135. Doc. [50] at 8. That statute provides that:

> [a]ny person, official, or institution complying with the provisions of sections 210.110 to 210.165 in the making of a report, the taking of color photographs and making of

---

[11] Defendants' argument that the burden is on Plaintiff to specifically allege facts justifying an exception to immunity is based on cases from the sovereign immunity context. *See* Doc. [50] at 5 (citing *State ex rel. Mo. Div. of Fam. Servs. v. Moore*, 657 S.W.2d 32, 34-35 (Mo. App. 1983) (state sovereign immunity)). They provide no authority providing for a presumption of immunity under MO. REV. STAT. §§ 210.114 or 210.135, and the Court is aware of none.

> radiologic examinations, or the removal or retaining a child pursuant to sections 210.110 to 210.165, or in cooperating with the division, or any other law enforcement agency, juvenile office, court, or child-protective service agency of this or any other state, in any of the activities pursuant to sections 210.110 to 210.165, or any other allegation of child abuse, neglect or assault, pursuant to sections 568.045 to 568.060, shall have immunity from any liability, civil or criminal, that otherwise might result of such actions. Provided, however, any person, official, or institution intentionally filing a false report, acting in bad faith, or with ill intent, shall not have immunity from any liability, civil or criminal. Any such person, official, or institution shall have the same immunity with respect to participation in any judicial proceeding resulting from the report.

MO. REV. STAT. § 210.135.1. The PFH Defendants argue that they complied in the removal or retaining of a child or in cooperating with the division pursuant to §§ 210.110 through 210.165 because N.J. was placed via a written placement agreement into the BNJJC which constituted a "voluntary placement agreement" as defined in MO. REV. STAT. § 210.122. Doc. [50] at 8-9. Plaintiff disagrees with the PFH Defendants' characterization of the placement agreement as falling within MO. REV. STAT. § 210.122.1. Doc. [59] at 7-9.

The Court agrees with Plaintiff. The Amended Complaint does not allege that N.J. was subject to a placement agreement falling within § 210.122.1's ambit. Under § 210.122.1, a "voluntary placement agreement" means "a written agreement between the department of social services *and a parent, legal guardian, or custodian* of a child seventeen years of age or younger solely in need of mental health treatment." MO. REV. STAT. § 210.122.1 (emphasis added). The placement agreement alleged in the Amended Complaint is between Defendant Wassenhove, N.J.'s legal guardian and a case manager with Children's Division, and the Second Circuit and/or the BNJJC. Doc. [46] ¶¶ 87, 88, 89. Thus, the Court cannot conclude that the PFH Defendants are entitled to immunity under MO. REV. STAT. § 210.135.

### B. The factual allegations against Francis suffice to support an inference of proximate causation.

The PFH Defendants also argue that the Amended Complaint fails to allege facts sufficient to support a conclusion that their actions proximately caused N.J.'s death. Doc. [50] at 9. They primarily contend that, because Plaintiff has not alleged that N.J. was placed in PFH's physical custody or control during his tenure at the BNJJC, the PFH Defendants had no ability to affect the relevant aspects of N.J.'s stay. *Id.* at 10. The Court disagrees.

"To show causation in any wrongful death case, a plaintiff must show that the negligence of the defendant 'directly cause[d]' or 'directly contribute[d] to cause' the patient's death." *Kivland v.*

18

*Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 306 (Mo. banc 2011) (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 863 (Mo. banc 1993)); *see also Tanner v. City of Sullivan*, 2013 WL 3287068, at *8 (E.D. Mo. June 28, 2013). Where the decedent commits suicide, the plaintiff must put on evidence that the suicide was the "'natural and probable consequence' of the injury he suffered at the hands of the defendant." *Kivland*, 331 S.W.3d at 309.

Assuming all well-pled facts as true and construing all reasonable inferences in Plaintiff's favor, the Amended Complaint does include allegations from which a jury may infer that Francis's negligence proximately caused N.J.'s death. While the Amended Complaint contains few (and in some instances, no) specific allegations as to some of the Government Defendants, the same is not true with respect to Defendant Francis. Harmon alleges that Francis, an employee of PFH, served as a social worker who tended to N.J. during his stay at BNJJC, Doc. [46] ¶¶ 61, 62, and that on April 10, 2018, Francis, aware that N.J. knew he was about to leave the BNJJC, met N.J. at the BNJJC for a consultation, *id.* ¶¶ 137, 140. During the visit, N.J. told Francis that he found sleeping a lot to be beneficial, as it meant that he "d[id]n't have to feel," *id.* ¶ 141, and Francis observed that N.J. had a flat affect, spoke in a matter-of-fact style, and refrained from making eye contact or displaying emotion. *Id.* ¶¶ 142-43. According to the Amended Complaint, Francis did not inform BNJJC staff, the Second Circuit, or the Children's Division of her concerning observations, but rather documented in a medical record that N.J. would no longer be receiving consultations. *Id.* ¶ 147. A reasonable jury could infer from such allegations that N.J.'s suicide was a probable consequence of Francis's actions.

### C. Harmon fails to state a claim a § 1983 claim against PFH.[12]

"Absent *respondeat superior*, to establish § 1983 liability of a private company, a plaintiff must allege facts sufficient to show the company was acting under color of state law and engaging in its own unconstitutional policies." *Dashley v. Corr. Med. Servs., Inc.*, 345 F. Supp. 2d 1018, 1021 (E.D. Mo. 2004) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). To prove a policy, custom, or action cognizable under § 1983, Harmon must allege facts showing "a continuing, widespread, persistent pattern of constitutional misconduct" by PFH's employees. *Crumpley-Paterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004) (quoting *S.J. v. Kansas City Mo. Pub. Sch. Dist.*, 294 F.3d 1025, 1028 (8th Cir. 2002)). PFH argues that Harmon's allegations against PFH are not only non-factual, but cannot be said to concern any policy, procedure, or widespread custom or practice upon which a valid § 1983

---

[12] Defendants Francis and PFH have not moved to dismiss or raised any argument supporting dismissal of Harmon's § 1983 claim as against Defendant Francis. Docs. [49] ¶ 3, [50] at 11.

claim must rest. Doc. [50] at 12. The Court agrees. Harmon must allege *facts* supporting the existence of an unconstitutional policy or custom. *Doe ex rel. Doe v. Sch. Dist. of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003) ("At a minimum, a complaint must allege facts which would support the existence of an unconstitutional policy or custom."). In Count VI, Harmon offers not specific factual allegations, but conclusions that Francis acted in accordance with unconstitutional policies, practices, or customs set by PFH. Doc. [46] ¶ 281. While it is true that Harmon need not specifically plead the existence of an unconstitutional policy or custom to survive a Rule 12(b)(6) motion, her Amended Complaint is nonetheless deficient as it "fail[s] to include any 'allegations, reference, or language by which one could draw an inference that the conduct complained of . . . resulted from an unconstitutional policy or custom.'" *Crumpley-Patterson*, 388 F.3d at 591 (quoting *Norfolk*, 340 F.3d at 614). Count VI against PFH will be dismissed.

Accordingly

**IT IS HEREBY ORDERED** that the Second Circuit, Normile Defendants, and Children's Division Defendants' Motion to Dismiss, Doc. [47], is **GRANTED**.

**IT IS FURTHER ORDERED** that Counts I, II, III, IV, V, VIII, and IX are **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendants Francis and PFH's Motion to Dismiss, Doc. [49], is **GRANTED in part**.

**IT IS FURTHER ORDERED** that Count VI against Preferred Family Healthcare is **DISMISSE**D.

Dated this 31st day of March, 2022.

SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE